UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ELEANOR ("RONNIE") BEHRINGER,

Plaintiff,

-against-

LAVELLE SCHOOL FOR THE BLIND and
FRANK SIMPSON,

Defendants.

Civil Action No.: 08-4899 (JGK-THK)

**DEFENDANTS' RULE 56.1 STATEMENT
OF MATERIAL UNDISPUTED FACTS**

---

Pursuant to Rule 56.1 of the Local Rules of the U. S. District Court for the Southern

District of New York, Defendants, Lavelle School for the Blind ("Lavelle" or the "School") and

Mr. W. Frank Simpson ("Simpson"), by their attorneys, Kelley Drye & Warren LLP, submit this

statement of undisputed material facts in support of their Motion to Dismiss and/or for Summary

Judgment pursuant to Rules 12 and 56(c) of the Federal Rules of Civil Procedure (the "Motion").

1.      Plaintiff, Ronnie Behringer, claims that she was diagnosed as an alcoholic in

1984. (103.)[1]  When she starting working at Lavelle in 1990, she had been sober for 6 years and

her only "treatment" was attending Alcoholics Anonymous ("AA") meetings. (106, 220-21; Park

Decl. Exs. 4 and 5; Compl. ¶ 17.)[2]

2.      In January 1993, Behringer allegedly had a relapse. (106-07, 134-36, 138-39.)

Even so, she was able to control her drinking so it did not impact her work at Lavelle. (107)

---

[1]   Numbers without prefix refer to pages from plaintiff's deposition, copies of which are annexed as
**Exhibit 2** to the April 23, 2010 Declaration of Jean Y. Park ("Park Declaration").

[2]   Numbers prefixed by "Compl. ¶ __" refer to paragraphs in the complaint which is annexed as **Exhibit
1** to the Park Declaration. Numbers prefixed by "Park Decl.__" or "Park Decl. Ex. __" refer to
paragraphs in or documents attached to the Park Declaration.

3.      Before and after the relapse, plaintiff informed several employees at Lavelle that she was a recovering alcoholic or "didn't drink." (111-13, 129-31, 133-35, 139; Tucker 61; Nanry 11; Welsh Aff. ¶ 4.)[3]

4.      Plaintiff went out on a leave of absence on or about January 28, 2003. (143, 159-61.)   The disability benefits claim forms she submitted to Lavelle did not reflect medical treatment for alcoholism. (144, 151-52, 162-64; Park Decl. Exs. 7 and 8.)

5.      Completed annual staff health forms plaintiff submitted to Lavelle between 2003 and 2007 similarly did not indicate that plaintiff was a recovering alcoholic or that she had any history of alcohol abuse or suffered from any physical or mental impairments, restrictions or limitations of any kind. (171-72, 176, 181-82, 184-85, 189-94; Park Decl. Exs. 9-13.)

6.      Plaintiff's recovering alcoholism does not prevent her from running, working out or participating in marathons and triathlons. (58, 336-37; Park Decl. ¶ 36; Park Decl. Exh. 34.)

7.      Alcoholism did not prevent Behringer from applying for and taking, in 2005, praxis exams to qualify as a teacher in Connecticut. (350-351.)

8.      Alcoholism did not impact Behringer's ability to testify at an arbitration hearing in June 2006 and assist Lavelle's labor attorney with contract negotiations. (VPD 16-17, 33.)[4]

9.      Plaintiff returned to work in September 1993 and never reported any physical or mental limitations due to her status as a recovering alcoholic. (Simpson Aff. ¶ 26.)[5]

---

[3]    Numbers prefixed by "Tucker __" or "Tucker Ex. __" refer to transcript pages and exhibits from the January 28, 2010 deposition of Diane Tucker, copies of which are annexed as **Exhibit 6** to the Park Declaration.   Numbers prefixed by "Nanry __" or "Nanry Ex. __" refer to transcript pages and exhibits from the January 28, 2010 deposition of Lorraine ("Lorrie") Nanry, copies of which are annexed as **Exhibit 19** to the Park Declaration.   Numbers prefixed by "Welsh Aff. __" or "Welsh Aff. Ex. __" refer to paragraphs in and exhibits attached to the accompanying April 23, 2010 Affidavit of Teresa Welsh.

[4]    Numbers prefixed by "VPD __" refer to transcript pages from the February 18, 2009 deposition of Vincent P. D'Andrea, Esq., copies of which are annexed as **Exhibit 14** to the Park Declaration.

[5]    Numbers and letters prefixed by "Simpson Aff. ¶ __" and "Simpson Aff. Ex. __" refer to paragraphs in and exhibits attached to the accompanying April 23, 2010 Affidavit of W. Frank Simpson.

10.     During the entire time plaintiff was at Lavelle, all employees were required to use a time clock. (385.)  From June of 2001 to February 28, 2007, plaintiff had the worst record of any Lavelle School administrator in terms of punctuality and compliance with the time card punch policies. (388-89, 490-92; Park Decl. Ex. 15; Simpson Aff. ¶¶ 18-19, 30, 37, 66.)

11.     In June of 2001, Simpson was hired as Superintendent and became plaintiff's supervisor. (Simpson 13; 222-23.)[6]  At the time, Behringer was School Principal and supervised two Program Directors, Lorrie Nanry and Diane Tucker, as well as Pupil Personnel Services ("PPS") Director, Adriane Horwitz. (Simpson Aff. ¶¶ 10, 16; Simpson Aff. Exs. B and D; Nanry 6.)

12.     On August 11, 2001, Simpson fired 4 employees.  None was disabled or had requested or taken FMLA leave at any time. (262, 277-79, 280-84; Simpson Aff. ¶ 8.)

13.     In September 2001, Simpson removed Horwitz from plaintiff's supervision and had Horwitz report directly to him. (Simpson Aff. ¶ 16.)

14.     In early 2002, Simpson scolded Behringer in front of a teacher telling her that she shouldn't be "in the trenches." Behringer concedes that this was a good point and that it was an appropriate instruction for Simpson to give. (269-70.)

15.     In January 2002, Simpson commended plaintiff for progress on goals established to bring the School into compliance. (Simpson Aff. ¶ 17; Simpson 48; Park Decl. Ex. 16.)

16.     On March 15, 2002, Simpson issued a written warning to Behringer for excessive tardiness. (613-14; Simpson Aff. ¶ 20.)

---

[6]     Numbers prefixed by "Simpson" refer to pages in the January 25, 2010 deposition transcript of W. Frank Simpson, copies of which are annexed as **Exhibit 3** to the Park Declaration.

17.     At least two or three times by early 2002, Behringer told Simpson, "I used to drink, but I don't drink anymore.  I'll have a Coke." (246-49, 288-89; Park Decl. Ex. 4 at P0406.)

18.     Behringer told Simpson that she had family members with drinking problems and talked about "meetings," which Simpson understood to mean AA meetings. (Simpson 61-63; Simpson Aff. ¶¶ 21-22.)

19.     Behringer's comments and disclosures, coupled with rumors that Simpson heard about Behringer's 1993 relapse, caused Simpson to believe that Behringer was a recovering alcoholic. (291-95; Simpson Aff. ¶ 24.)  Behringer herself "feels certain" that Simpson knew she was a recovering alcoholic as early as August 2001 (around the Simpson fired 4 teaching assistants). (291-95; Park Decl. Ex. 4; Simpson Aff. ¶¶ 8, 24.)

20.     Simpson considered the relapse "ancient history" and did not think plaintiff's recovering alcoholism had any bearing on her job at Lavelle. (Simpson Aff. ¶ 25.)

21.     On April 24, 2002, Simpson reappointed Behringer as Principal for the 2002-03 School year. (Simpson 48-49; Park Decl. Ex. 17; Simpson Aff. ¶ 27.)

22.     On August 22, 2002, Simpson supported a salary increase and certification award for Behringer. (Simpson 49; Park Decl. Ex. 18; Simpson Aff. ¶ 28.)

23.     On October 7, 2003, Simpson issued Behringer a performance evaluation noting deficiencies in her collegiality/collaboration, punctuality, and support for the Pre-School/UPK program. (296-97; Park Decl. Exs. 4 at P0406 and 20; Simpson 66; Simpson Aff. ¶¶ 29-32.)

24.     Both Nanry and Tucker reported difficulties working with plaintiff. (Nanry 22; Park Decl. Ex. 21 at P0395; Tucker 95-99; Park Decl. Ex. 22 at P0392 ¶2.)

25.     Effective October 27, 2003, Simpson reorganized the School into three programs: the Pre-School, the Lower School and the Upper School.  Simpson demoted Behringer to the

-4-

position of Principal of the Lower School, which reduced the scope of her work responsibilities by 2/3rds. (221-22; Simpson 25-26; Park Decl. Ex. 23; Simpson Aff. ¶¶ 33-34.)

26.     Simpson promoted Tucker and Nanry to Principals of the Pre-School and the Upper School. (Simpson 25; Park Decl. Ex. 23;  Simpson Aff. ¶ 35; Nanry 5; Tucker 6-7.)

27.     As Lower School Principal, Behringer worked the 10-month School schedule and had to take her vacations during School recesses. (Simpson Aff. ¶¶ 34, 36; Simpson Aff. Ex. F.)

28.     On January 6, 2005, Simpson gave plaintiff a favorable performance review for the period September 2003 through December 2004. (Simpson Aff. ¶ 38-39; Simpson Aff. Ex. G.)

29.     In March of 2005, Horwitz, died very suddenly and the 3 Principals were required to absorb her PPS duties. (Simpson Aff. ¶ 45; Simpson 118-19.)

30.     In April of 2005, plaintiff's father, John McGlone, was diagnosed with lung cancer and Behringer traveled to Viriginia, where he was receiving medical care. (531, 541.)  No one discouraged her from doing so. (526.)

31.     In May 2005, plaintiff applied for and was granted intermittent FMLA leave to care for her father while he was undergoing treatment in Virginia. (513-18, 523; Park Decl. Ex. 26; Simpson 74-76, 80; Simpson Aff. ¶ 41-44.)

32.     Behringer was out on FMLA leave from: (i) May 2 to May 13, 2005; (ii) May 31 – June 7, 2005 and (iii) October 11 – October 17, 2005. (527, 529-30, 538-41, 545, 549, 552; Park Decl. Ex. 28.)  No one discouraged, dissuaded, or restrained Behringer from taking this intermittent leave from work. No one interfered with these leaves or harassed plaintiff for taking such leave. (528-29, 545, 553.)

NY01/PARKJE/1409692.7

33.     In October of 2005, Simpson changed School policy to allow employees, such as plaintiff, to use accrued by unused sick time to cover FMLA leaves. (531; Simpson Aff. ¶ 47.) Behringer benefited from this policy change. (Simpson Aff. ¶ 47; Simpson 82-83.)

34.     In November 2005, Behringer took FMLA leave for 2.5 weeks and flew down to Grand Bahama Island, where her father lived.  (553-55, 561.)  Simpson did not interfere with, dissuade or restrain Behringer from taking this leave in November nor did he harass or otherwise interfere with her FMLA rights while she was out. (554-55, 581-82.)

35.     Plaintiff's November 2005 trip coincided with the annual Conchman Triathlon, an event Behringer and family members repeatedly participated in. (556-560; Simpson 94.)   In 2004, Simpson had approved plaintiff's request to participate in this race even though plaintiff was on the 10-month work schedule. (563-65, 566; Simpson Aff. ¶ 39.)

36.     Nanry and Tucker, who had to cover for plaintiff while she was out, as well as Controller, Teresa Welsh, complained to Simpson that Behringer was misusing FMLA to participate in the triathlon and requested he investigate. (553, 583-84; Simpson 91-94; Nanry 13, 26-28; Welsh Aff. ¶¶ 6-9; Tucker 50, 62, 111-15.)

37.     Simpson did.  He went onto the Internet and found out that plaintiff competed in this race. (Simpson 96, 99-100; Park Decl. Ex. 29; Tucker 114; Simpson Aff. ¶ 49.)

38.     When Behringer returned to work on November 21, 2005, Simpson asked her about her activities while out on FMLA leave. (582, 584-88, 591-93; Simpson Aff. ¶¶ 50-53.)

39.     Behringer refused to give Simpson the information he requested. (582, 600, 603-08, 610-11; Simpson Aff. ¶¶ 52-53; Simpson Aff. Ex. H.)

40.     Simpson did not pursue the matter further and took no disciplinary action against Behringer for refusing to provide the information he requested. (608, 610-11; Simpson Aff. ¶¶ 54-56.)

41.     Behringer did not take or need any FMLA after November 2005. (609.)

42.     On January 11, 2006, Simpson issued annual performance evaluations to each of the Principals. These evaluations covered the period January 2005 through January 2006. (Simpson Aff. ¶ 58.)

43.     Simpson began preparing these evaluations in the fall of 2005 by collecting data and paperwork on each of the Principals and then reviewing their prior ratings and comparing their relative performance. (Simpson Aff. ¶¶ 59-60.)

44.     Simpson gave Behringer an overall rating of "below expectations" and assessed her as "below expectations" or "significantly below expectations" in several individual categories. (Simpson 123-139; Simpson Aff. ¶¶ 61-66; Park Decl. Ex. 30.)

45.     In the summer of 2005, Behringer did not consult the other Principals in annual scheduling for the 2005/06 School year. (503-04; Simpson 129-30; Park Decl. Ex. 31; Tucker 94-99; Park Decl. Ex. 22 at P0393-94.)

46.     In the spring or fall of 2005, Behringer told "Margo," an occupational therapist, that Simpson was forcing the School to be out of compliance. (Simpson 134-35; Park Decl. Ex. 32.)

47.     In 2005, the Controller's Office complained to Simpson about plaintiff's excessive personal telephone usage for long distance and international calls. (Welsh Aff. ¶¶ 12-16; Simpson Aff. ¶¶ 62-64.)  Outstripping anyone else, plaintiff spent over 22 hours in personal calls during working hours between August 2004 and May 2005. (Simpson Aff. ¶ 64.)

48.     Between January 2005 and December 31, 2005, Behringer was tardy 18 times and did not punch in/out 14 times. (613-15; Park Decl. Ex. 15; Simpson Aff. ¶ 66.)

49.     In 2005, Ellen Trief, a Hunter College professor and consultant to the School, told Simpson that Behringer was not committed to implementing the "universal tangible cues" program. (Simpson 136-37; Trief Decl. ¶¶ 4-10.)[7]

50.     On January 19, 2006, Behringer requested a reevaluation and Simpson agreed to give her one. (624-25; Simpson Aff. ¶ 69.)   He also agreed to change a rating in plaintiff's January 11, 2006 performance evaluation and to include a positive addendum regarding plaintiff's work on MOVE. (Simpson 120-21; Park Decl. Ex. 33; Simpson Aff. ¶ 68; Simpson Aff. Ex. J.)

51.     On April 12, 2006, Simpson gave plaintiff a new evaluation, to which she had no objections, and reappointed her for the 2006-07 School year. (461, 625-26; Simpson Aff. ¶ 69.)

52.     On June 23, 2006, during a labor arbitration hearing, plaintiff told Simpson and Mr. D'Andrea that she was a recovering alcoholic. (479; VPD 57-61.)  Simpson did not express any surprise at this disclosure and responded by saying, "So what's that got to do with it?"  (630-31; VPD 61, 64-65; Simpson 156-60; Tucker 103-04; Nanry 29-30.)   Nanry believed that Simpson already knew that Behringer was a recovering alcoholic at that time. (Nanry 28-29, 39.)

53.     Neither Nanry nor Tucker noticed any change in Simpson's behavior toward Behringer after this disclosure. (Nanry 30; Tucker 104.)

54.     During staff meetings with his Principals on July 26, 27, 31 and August 2, 2006, Simpson became frustrated over a host of issues, including scheduling and functional vision assessments and berated Behringer, Nanry and Tucker. (160-66, 487, 500-05, 508; Tucker 24-25, 33-34, 40-42, 106-09; Park Decl. Exs. 21, 22 and 24; Nanry 15-16, 20-21, 33-35.)

55.     Nanry and Tucker deny that plaintiff was "singled out" in any way at these meetings. (Nanry 34-35; Tucker 106-07.)

---

[7]     Numbers prefixed by "Trief Decl.___" refer to paragraphs in the Declaration of Ellen Trief, Ed.D, sworn to on April 23, 2010.

56.     In September 2006, on the very first day of school, as plaintiff was entering the building, Simpson make a remark that he was surprised to see plaintiff back at work. (464, 488, 508-09; Simpson 167-68.)  Simpson said the same thing to Nanry and Tucker. (Simpson 167-68; Tucker 51-53; Nanry 36-37.)

57.     In December 2006, Simpson asked plaintiff and other employees whether he could get them drinks during a Lavelle holiday party. (482-83; Simpson 169-70; Nanry 12; Welsh Aff. ¶ 18.)  Nanry, Tucker and Welsh understood Simpson was acting as the host at this holiday party. (482-83, 511; Simpson 169-70; Nanry 12, 25-26; Welsh Aff. ¶ 18.)

58.     In January 2007, Simpson issued plaintiff a written warning for failing to swipe in and out in violation of School policy. (488-90.)  Plaintiff admits to the infraction. (492-95; Park Decl. Ex. 21 at DEF306-07.)  Around this same time period, Simpson also issued a written warning to Nanry for punctuality infractions, which were also noted in Nanry's August 20, 2008 performance evaluation. (Nanry 8-9, 41-42.)  Nanry never violated the policy again. (Nanry 9.)

59.     On February 13, 2007, plaintiff became involved in an incident in the School gym involving "Destiny," a female student in the Lower School. (390-91.)  Also present were: (i) the School nurse, Susan Kiley; (ii) Destiny's teacher, Natasha Mousami; (iii) the gym teacher, Karen Gerweck, and (iv) a job coach, Paco Secada ("Paco"), who was there with students, "Orlando G" and "David G", preparing to go to a job site. (391-93; Wier Aff. ¶ 8.)[8]

60.     Behringer claims that Paco and Orlando G "were both looking at Destiny's ass" and that she had to tell Paco to "please" back away with his student. (391, 394-95, 404.)

61.     Behringer then spoke with Gary Wier, the Transition Coordinator and Paco's supervisor, who was also in the gym. (391-94; Wier Aff. ¶¶ 10-13.)  Plaintiff told Wier that "Destiny's pants were down, her rear end was showing, and Paco was standing with a student

---

[8]     Numbers prefixed by "Wier Aff. ¶ __" and "Wier Aff. Ex. __" refer to paragraphs in and exhibits attached to the accompanying Affidavit of Gary Wier, sworn to on April 22, 2010.

much too close." She told Wier that it was "pretty outrageous, actually, the student's rear end was showing, and Paco did not move the student out of the line of vision." (401-02.)

62. Behringer told Wier, "It did look like Destiny's rear end was showing to the point where it looked like she was getting a suppository." (402, 409-10; Wier Aff. ¶ 13.)

63. Wier did not believe Paco did anything wrong and felt Behringer's behavior created an atmosphere of stress and anxiety for him, Paco and his students. He told Paco to leave the gym with the students in order to avoid further conflict. (Wier Aff. ¶¶ 14-17.)

64. Paco complained to Wier, both verbally and in writing, about plaintiff's treatment and her false accusation that he was "gawking" at Destiny. (430-32; Park Decl. Ex. 25; Wier Aff. ¶¶ 18, 20.)

65. On February 14th, Wier sent Behringer an e-mail, advising her that he had spoken with Paco. Behringer responded by thanking Wier and telling him that no further action was necessary. (Wier Aff. ¶ 21; Wier Aff. Ex. B; 426-28.)

66. Wier then reported the February 13th incident to Tucker, his immediate supervisor. (Wier Aff. ¶ 23; Tucker 68.) He complained that Behringer was inappropriate and unprofessional and told Tucker that Behringer had screamed at Paco for not leaving the gym while a female student was having a tantrum and Behringer claimed that the student was having a suppository. (429; Tucker 69-70; Wier Aff. ¶ 23.)

67. Tucker became concerned about the suppository report and questioned the School nurse, Susan Kiley. (Tucker 82-83.) Kiley denied administering a suppository to Destiny and told Tucker that Behringer had flown off the handle and "please" was not a word plaintiff used when addressing Paco. (Tucker 75.)

68. Tucker spoke with Wier again and asked him to confirm where he had heard about the suppository. Wier said it was from Behringer. (Tucker 83-85; Wier Aff. ¶ 25.)

69.     Wier also reported the February 13th incident to Simpson and gave Simpson copies of Paco's e-mail complaint as well as his e-mail exchange with Behringer. (Wier Aff. ¶ 24; Wier Aff. Exs. A and B; Simpson Aff. ¶¶ 74-75; Simpson 234-35, 238.)

70.     On February 15, 2007, Behringer called and told Tucker about the February 13th incident, stating (twice) that Destiny had "ripped her clothes off and was rolling around the floor naked." (Tucker 71-72; 422-25.)

71.     Plaintiff also told Tucker that Paco was gawking, watching this naked girl on the floor, and wouldn't move away when she (plaintiff) asked him to move. (425; Tucker 72-73.) Behringer reported that she had to speak with Wier and instruct him to talk with Paco about his inappropriate behavior. (Tucker 74.)

72.     Tucker now became alarmed at the report that Destiny was naked in the gym being gawked at by a male job coach and spoke with Wier again who denied Behringer's account. (Tucker 75-76; Wier Aff. ¶ 25.)

73.     Tucker spoke with Simpson, and told him she was concerned about plaintiff's conduct. (Tucker 76-81; Simpson Aff. ¶¶ 76-81.)   Simpson decided that to conduct an investigation and did so when School recommenced after the Spring Recess on February 26, 2007. (Simpson Aff. ¶¶ 85-89.) He interviewed all of the employees present during the February 13th incident. (443-44; Tucker 79-80; Simpson Aff. ¶ 90.)

74.     Not a single witness corroborated Behringer's claim that Destiny "had her pants down and her ass out" or was "rolling around the floor naked from the waist down." (447; Simpson Aff. Ex. L; Gerweck Aff. ¶¶ 2-4.)

75.     Not a single witness corroborated Behringer's claim that Paco and/or Orlando were staring or gawking at Destiny. (Simpson 227; Gerweck Aff. ¶ 4.)

NY01/PARKJE/1409692.7

76.     Not a single witness supported, as reasonable, Behringer's belief that Destiny "looked like" she was receiving a suppository. (Simpson 227.)

77.     The only time such treatment was prescribed and implemented was for "Danny G," a child with a seizure disorder, and then, an entire plan of action was set up to ensure proper administration of the suppository. (Simpson Aff. ¶¶ 76-79; 413-16.) Destiny was not having a seizure and was not under any kind of medication plan requiring her to have rectal suppositories. (418.) No Lavelle student has ever been administered a rectal suppository with five people standing around; this would have been abusive and contrary to standard of care. (417-20; Simpson Aff. ¶ 80.)

78.     Several employees reported plaintiff being nasty, sarcastic and uncivil to Paco in the presence of his student, Orlando G. (445; Simpson Aff. Ex. L at DEF1382, 1389.)

79.     On February 26th, Simpson spoke with Behringer about the incident, who considered the matter a "non-event" and "not worthy of a lot of time." (420, 422, 437-43.)

80.     After his interviews, Simpson decided to terminate plaintiff for inappropriate conduct surrounding the February 13th incident. (Simpson 34.)

81.     On February 28, 2007, Simpson informed Behringer that she was being discharged and handed her a termination memo, which stated that plaintiff was being terminated for "behavior in the work environment that is unacceptable for an administrator and a Lavelle School employee." (86, 376-77, 383-84; Park Decl. Ex. 35.)

82.     Plaintiff admits that sarcasm, screaming or snapping at Paco and Paco's student would not have been appropriate behavior on her part. (411-12.)

83.     Falsely reporting child abuse is a serious infraction and a terminable offense. (447-48.) Falsely reporting another employee of acting in a sexually predatory way toward a student is a serious infraction and a terminable offense. (449.)

84.     Behringer admits that had she falsely reported that Paco was staring at a naked female student receiving a rectal suppository, this would have been grounds for termination. (450.)

85.     There was no policy or practice, written or otherwise, requiring Lavelle to engage in progressive discipline for employee misconduct. (Simpson Aff. ¶ 91; Simpson 35.)  Simpson has summarily discharged other employees for inappropriate conduct toward students and other employees. (Simpson Aff. ¶ 92.)   None of these employees was disabled or had taken or requested FMLA leave. (*Id.* at ¶ 93.)

86.     Since Simpson has been Superintendent, over 50 employees have taken FMLA leave and returned to work without incident. (Simpson 34; Simpson Aff. ¶ 72; 478-79.)

87.     Teresa Kavanaugh, the School receptionist and one of Simpson's direct reports, took FMLA leave from March 22, 2004 through July 1, 2004, returned to work without incident and remains an employee in good standing to this day. (Simpson Aff. ¶ 73.)


Dated: New York, New York            KELLEY DRYE & WARREN LLP
       April 23, 2010


                                     By: _____
                                         Jean Y. Park
                                         101 Park Avenue
                                         New York, New York 10178
                                         (212) 808-5019
                                         Attorneys for Defendants
                                         LAVELLE SCHOOL FOR THE BLIND
                                         and FRANK SIMPSON