Kenneth A. Goldberg, Esq. (KG 0295)
**GOLDBERG & FLIEGEL LLP**
60 East 42nd Street, Suite 3421
New York, New York 10165
(212) 983-1077
Attorneys For Plaintiff
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
ELEANOR ("RONNIE") BEHRINGER,

                                   :

                    Plaintiff,            **08-4899 (JGK) (THK)**

                                   :

                    vs.                 **PLAINTIFF'S STATEMENT OF**

                                   :            **DISPUTED FACTS UNDER LOCAL RULE**

LAVELLE SCHOOL FOR THE BLIND AND     **56.1**
FRANK SIMPSON,

                                   :

                  Defendants.     x
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

          Plaintiff submits the following statement of disputed facts ("Pl. Stmnt.") in opposition to

Defendants' motion for summary judgment ("Def. Br."). Unless expressly admitted herein,

Plaintiff denies the allegations in Defendants' Statement. Plaintiff further denies Defendants'

Statement to the extent it is inconsistent with the additional facts set forth herein. Plaintiff

objects to Defendants' Rule 56.1 statement under Local Civil Rule 56.1(a).[1]

---

[1] Citations to the Complaint and Answer are to "Compl." and "Ans." The Complaint was
marked as Pl. Dep. Exh. 16 and Def. Dep. Exh. 16 and is sometimes cited as such. The Answer
was marked as Pl. Dep. Exh. 17 and is sometimes cited as such. Citations to deposition
testimony is as follows: (1) Plaintiff - "RB Dep."; (2) Vincent D'Andrea - "VD Dep."; (3) Lorrie
Nanry - "LN Dep."; (4) Frank Simpson - "FS Dep."; and (5) Diane Tucker - "DT Dep." Copies
of the above pleadings and deposition transcripts are annexed as Exhibits A through G to the
Goldberg Certification filed herewith. Copies of Plaintiff's deposition exhibits and Defendants'
deposition exhibits cited herein are annexed to the Goldberg Certification as Exhibits H and I,
                                                       `(continued...)`

## POINT I

## PARAGRAPH BY PARAGRAPH RESPONSE PURSUANT TO RULE 56.1(b)

1.      In response to Paragraph 1, admits that Plaintiff was diagnosed as an alcoholic in 1984, admits Plaintiff joined Lavelle in 1990 and had been sober for six years, and admits Plaintiff was receiving treatment by attending Alcoholics Anonymous meetings, and refers to the Complaint for additional details regarding Plaintiff's claims.  (RB Dep. 102-3, 115; Compl.).

2.      In response to Paragraph 2, admits that Plaintiff suffered a relapse in January 1993, and admits Plaintiff was able to work for a period of time during the relapse and immediately prior to a medical leave, and refers to the Complaint for additional details regarding Plaintiff's claims.  (RB Dep. 106-8, 138; Compl.).

3.      Denies Paragraph 3, except admits that Plaintiff informed certain Lavelle employees that she was a recovering alcoholic, admits that Plaintiff informed certain Lavelle employees that she doesn't drink (RB Dep. 111-13, 129-35, 139), avers that stating "I don't drink" is not the same thing as stating "I'm a recovering alcoholic", and avers that a person that says "I don't drink" is not identifying herself as a recovering alcoholic. (RB Dep. 113, 632-3).

4.      Denies Paragraph 4, except admits that Plaintiff went on a medical leave of absence beginning the end of January 1993, refers to Plaintiff's medical documents and disability benefits forms for their terms, and avers that certain of Plaintiff's medical documents reference her alcoholism and "alcoholism secondary to sever[e] depression."  (RB Dep. 147; Def. Dep.

---

[1](...continued)

respectively.  Citations to Plaintiff's Affidavit dated May 18, 2010 are to "RB Aff." and citations to the Affidavit of Karen Gerweck dated May 16, 2010 are to "Gerweck Aff. II", filed herewith.

Exh. 9 at Bates Number DEF00470 ("alcoholism secondary to sever[e] depression"); Goldberg

Cert., Exhs. J, N).

 5.  Admits Paragraph 5.

 6.  Admits Paragraph 6.

 7.  Admits Paragraph 7.

 8.  Admits Paragraph 8.

 9.  Admits Paragraph 9.

 10.  Denies Paragraph 10, except admits that Lavelle employees used a time clock and

refers to Defendants' records regarding time clock use for its contents, and avers that Defendant

never suspended Plaintiff for any matter and never put Plaintiff through Defendants' multi-step

process for discipline.  (RB Dep. 385, 491, 636; FS Dep. 139, 173).

 11.  Admits Paragraph 11.

 12.  Denies Paragraph 12, except admits that during 2001 Mr. Simpson  terminated

several employees.  (RB Dep. 262, 277-87).

 13.  Denies Paragraph 13, except refers to Mr. Simpson's affidavit for the allegations

therein and avers that such allegations are irrelevant (see Simpson Aff. ¶ 16), and refers to

Plaintiff's evaluations from that time period (Pl. Dep. Exh. 26; Pl. Dep. Exh. 27).

 14.  Denies Paragraph 14, except admits that in or about 2002, Plaintiff intervened to

help a teacher prevent a student from licking outlets, to protect the student, and Mr. Simpson

screamed at and/or spoke loudly to Plaintiff to stay out of the "trenches."  (RB Dep. 267-72).

 15.  Admits Paragraph 15 and avers that on or about January 11, 2002, Mr. Simpson

issued a memorandum to Ms. Behringer stating, among other items:   "Overall, your work rating

thus far this year is excellent and the school is very fortunate to have you as a key administrator."
(Compl. ¶ 29; Pl. Dep. Exh. 26; FS Dep. 48).

16.     Denies Paragraph 16, except admits that on or about March 15, 2002, Mr.
Simpson gave Plaintiff a "lateness notice" to which Plaintiff objected.  (Simpson Aff. ¶ 20;
Goldberg Cert., Exh. Q; RB Dep. 613-4).

17.     Denies Paragraph 17, except admits that at some point by about 2002, and "maybe
two or three times," Plaintiff told Mr. Simpson words to the effect of "I don't drink" and refers to
Plaintiff's complete testimony for its contents. (RB Dep. 288-9).

18.     Denies Paragraph 18 and avers that Plaintiff did not tell Mr. Simpson she had
family members with drinking problems and did not tell Mr. Simpson about AA meetings.  (RB
Aff. ¶ 2).

19.     Denies Paragraph 19, denies Plaintiff "feels certain" Mr. Simpson knew she is a
recovering alcoholic as early as August 2001, avers that during the EEOC proceedings in 2007
and 2008, Defendants repeatedly asserted to EEOC that Defendant Frank Simpson was unaware
that Plaintiff is a recovering alcoholic until June 2006, when Plaintiff told him that she is a
recovering alcoholic during an arbitration proceeding (Pl. Dep. Exh. 10; Pl. Dep. Exh. 12), avers
that Defendants' own witnesses Lorrie Nanry and Diane Tucker corroborated same to EEOC (Pl.
Dep. Exh. 17; Pl. Dep. Exh. 63; Pl. Dep. Exh. 66), avers that in 2007 Plaintiff told EEOC that in
2001/2002, Plaintiff thought Mr. Simpson knew she was a recovering alcoholic (RB Dep. 289-
90, 295, 634-5), avers that several months after Plaintiff spoke with EEOC, and in 2008, Plaintiff
received and reviewed the EEOC's file, which contained materials that Plaintiff had not
previously seen (RB Dep. 634), and avers that as Plaintiff explained during her deposition, in

2008, after she received and reviewed the EEOC's file, including Defendants' EEOC submissions and EEOC's investigative memoranda, her belief changed because, among other items, Defendants (including Mr. Simpson) repeatedly represented to EEOC that Mr. Simpson did not know Plaintiff was a recovering alcoholic until she told him that in June 2006, and similar statements were made to EEOC by both Ms. Nanry and Ms. Tucker, as documented by the EEOC.  (RB Dep. 635, 640-8; Pl. Dep. Exh. 63; Pl. Dep. Exh. 66; See Point II-S below).

20.     Denies Paragraph 20 and avers that prior to Plaintiff's 2006 disclosure of her recovering alcoholic status to Mr. Simpson, Mr. Simpson knew nothing of Plaintiff's medical condition, avers that Mr. Simpson did not read any medical documents about Plaintiff and knew nothing of her medical condition from her file, avers that Mr. Simpson never discussed that with Plaintiff (FS Dep. 52-8, 209), and avers that Mr. Simpson did not discuss Plaintiff's medical condition or history with anyone at Lavelle when she worked there.  (FS Dep. 64-5).

21.     Admits Paragraph 21 and avers that in April 2002, Mr. Simpson gave Plaintiff a letter renewing her employment, in which he stated, among other items, "I congratulate you on your work and hope you continue to perform at this exceptional level," and refers to the document for its complete contents.  (Pl. Dep. Exh. 27; FS Dep. 48-9, 67-8).

22.     Admits Paragraph 22 and avers that Plaintiff received a letter, signed by Mr. Simpson, stating "The Board of Trustees recognizes your expertise and commitment to excellence that is reflected in your work."  (Pl. Dep. Exh. 28; FS Dep. 49-50).

23.     Denies Paragraph 23, except admits that in or about October 2003, Plaintiff received an evaluation stating "Ms. Behringer's overall rating for 2002-2003 is Met

Expectations", avers that Mr. Simpson wrote the "summary" section, and refers to that document

for its complete contents.  (Pl. Dep. Exh. 30; FS Dep. 66-7; <u>see also</u> Pl. Dep. Exh. 29).

24.      Denies Paragraph 24 and avers that Ms. Nanry and Ms. Tucker, who had reported

to Plaintiff for a period of time (DT Dep. 6-8; LN Dep. 6), did not file any complaints about

Plaintiff. (DT Dep. 55, 118; LN Dep. 38).

25.      Denies Paragraph 25, except admits that in October 2003, Mr. Simpson

implemented a reorganization, by which there was a Pre-School, Lower School and Upper

School, by which Plaintiff was made Principal of the Lower School, and by which changes were

made to her job duties. (RB Dep. 221-2; Pl. Dep. Exh. 31).

26.      Admits Paragraph 26.

27.      Admits Paragraph 27.

28.      Admits Paragraph 28 and avers that in January 2005, Defendants issued an

evaluation to Ms. Behringer, for the period September 2003 to December 2004, stating that her

overall rating was "Met Expectations."  (Compl. ¶ 32; Pl. Dep. Exh. 32; FS Dep. 72-3).

29.      Admits Paragraph 29.

30.      Admits Paragraph 30.

31.      Denies Paragraph 31, except admits that Ms. Behringer exercised her legal right to

take protected leave under the FMLA to care for her ailing father, admits that in May 2005,

Plaintiff submitted forms applying for FMLA leave on an intermittent basis (Pl. Dep. Exh. 34; FS

Dep. 61, 74-7; RB Dep. 513-519, 524-5; Def. Dep. Exh. 25; Def. Dep. Exh. 26), avers that the

request was purportedly "approved" (RB Dep. 523-5), and avers that according to Mr. Simpson,

Plaintiff was entitled to FMLA leave. (Simpson Aff. ¶ 43-44).

32.     Denies Paragraph 32, except admits that Plaintiff took FMLA leave on various

dates during the time frames of May 2-13, 2005, May 31-June 7, 2005, and October 11-17, 2005

(Def. Dep. Exh. 25; Def. Dep. Exh. 28; RB Dep. 526-30, 549, 552), avers that Defendants did

not stop Plaintiff from taking those days (RB Dep. 528-9, 545, 553), and avers that Mr. Simpson

discriminated against, harassed and retaliated against Plaintiff for taking FMLA leave, as

discussed below.  (See Point II-F below).

33.     Denies Paragraph 33, except admits that in October 2005, Mr. Simpson allowed

Plaintiff to utilize sick days for her FMLA days (RB Dep. 530-1, 598), admits that Mr. Simpson

issued policies (FS Dep. 36-7; Pl. Dep. Exh. 23) and avers that there was a handbook. (FS Dep.

34-6).

34.     Denies Paragraph 34, except admits Plaintiff took FMLA leave in November 2005

and traveled to Grand Bahama Island where her dying father was residing, admits that Mr.

Simpson did not stop Plaintiff from taking such leave, and avers that Mr. Simpson discriminated

against, harassed and retaliated against Plaintiff for taking FMLA leave, as discussed below. (RB

Dep. 563-6).  (See Point II-F below).

35.     Denies Paragraph 35, except admits that on Saturday, November 5, 2005, while

Plaintiff was in the Bahamas, she spent less than two hours participating in a triathlon, as a form

of personal exercise, avers that other family members that had traveled to visit with Plaintiff's

father one last time before his death, also participated  (RB Dep. 555-61, 537, 563-7, 567-568;

Def. Dep. Exh. 29; Pl. Dep. Exh. 39), avers that in 2004, Plaintiff used accrued and unused

personal/vacation time, to which she was entitled, to participate in that event (RB Dep. 563-7;

Simpson Aff. ¶ 39), and avers that Ms. Tucker traveled to Hawaii during the school year.  (RB

Dep. 564-5).

36.    Denies Paragraph 36, except admits that Principals covered for each other, and

avers that no such complaints were filed about Plaintiff and Defendants have not produced any

written complaint filed about Plaintiff by Ms. Nanry, Ms. Tucker or Ms. Welsh.  (DT Dep. 55,

118; LN Dep. 38).

37.    Denies Paragraph 37, except admits that, as Plaintiff testified, "In the fall of '05

he [Mr. Simpson] wrote me up for exercising on a Saturday after trolling the Internet to see what

I was doing on weekends" (RB Dep. 460-1; see also FS Dep. 90-91; Pl. Dep. Exh. 39; FS Dep.

99-101).

38.    Denies Paragraph 38, except admits that when Plaintiff returned from her

protected FMLA leave, and on or about November 21, 2005, Mr. Simpson confronted her with

false and harassing allegations regarding her FMLA leave, demanding an explanation for

Plaintiff's use of non-FMLA days and the timing of her plane ticket purchase and registration for

the November 5 event  (FS Dep. 86-87; RB Dep. 581-3, 587-90), avers that on or about

November 23, 2005, Mr. Simpson issued a memorandum to Plaintiff, placing a memorandum in

her personnel file, raising false and harassing allegations about her FMLA leave and violating her

rights under the FMLA, avers that Mr. Simpson essentially falsely accused Ms. Behringer of

abusing her FMLA leave when she participated in a triathlon on a Saturday (November 5, 2005)

a non-FMLA day, and avers that Mr. Simpson unlawfully demanded an accounting of Plaintiff's

activities on a Saturday, which was a non-FMLA day. (Compl. ¶ 32; Pl. Dep. Exh. 5; Pl. Dep.

Exh. 38; FS Dep. 88-90; RB Dep. 581-7, 591-2, 599-602).

39.     Denies Paragraph 39 and avers that Plaintiff submitted a memorandum to Mr. Simpson dated December 15, 2005 and responded to Mr. Simpson's November 23, 2005 memorandum.  (Compl. ¶ 33; Pl. Dep. Exh. 6; Pl. Dep. Exh. 40; FS Dep. 102-104; RB Dep. 602-8).

40.     Denies Paragraph 40 and avers that in January 2006, Mr. Simpson issued a performance evaluation to Ms. Behringer raising false criticisms of her job performance, defaming her, and falsely alleging that her performance was "below expectations", avers that Ms. Behringer's job performance was, in fact, exemplary, and avers that Mr. Simpson issued the evaluation as an act of discrimination, harassment and retaliation for Plaintiff's protected FMLA complaints. (Compl. ¶ 34; Pl. Dep. Exh. 45; FS Dep. 120-1, 124-5; RB Dep. 611-13, 628).

41.     Denies Paragraph 41 and avers that, as set forth in Defendants' own records, in February 2006, Ms. Behringer took protected FMLA leave/bereavement leave to care for her ailing father and, on February 28, 2006, he died.  (Compl. ¶ 36; RB Dep. 617-23; Pl. Dep. Exh. 35 at Bates P0711; Def. Dep. Exh. 32; FS Dep. 154).

42.     Denies Paragraph 42, except admits that in January 2006, Mr. Simpson issued a performance evaluation to Plaintiff and refers to same for its contents.  (Pl. Dep. Exh. 45).

43.     Denies Paragraph 43, except admits that in January 2006, Mr. Simpson issued a performance evaluation to Plaintiff and refers to same for its contents.  (Pl. Dep. Exh. 45).

44.     Denies Paragraph 44, denies Mr. Simpson conducted an "assessment", avers that Mr. Simpson issued a performance evaluation to Ms. Behringer, raising false criticisms of her job performance, defaming her, and falsely alleging that her performance was "below expectations," avers that Ms. Behringer's job performance was, in fact, exemplary, and avers that Mr. Simpson

issued the evaluation as an act of discrimination, harassment and retaliation for Plaintiff's protected FMLA complaints and exercise of FMLA rights. (Compl. ¶ 34; Pl. Dep. Exh. 45; FS Dep. 120-1, 124-5; RB Dep. 611-13, 628).

45.     Denies Paragraph 45, except admits that in the Summer of 2005, Plaintiff had prepared a schedule and changed it after learning it impacted other schedules. (RB Dep. 503-4).

46.     Denies Paragraph 46 and avers that Plaintiff did not tell Margo (Occupational Therapist) that Mr. Simpson was forcing Lavelle to be out of compliance.  (RB Aff. ¶ 7).

47.     Denies Paragraph 47, except admits that with Defendants' permission, Plaintiff made telephone calls and reimbursed Lavelle for the calls (Pl. Dep. Exh. 42; FS Dep. 113-4; RB Aff. ¶ 5), and avers that, according to Defendants, Defendants did not strictly enforce any policy prohibiting personal telephone calls. (See, e.g., Welsh Aff. ¶ 13, 17).

48.     Denies Paragraph 48, except refers to Defendants' records for their contents. (Park Decl. Exh. 15).

49.     Denies Paragraph 49, avers that Ms. Trief's Declaration contains inadmissible hearsay statements, avers that the Court should strike Ms. Trief's Declaration because Defendants failed to identify Ms. Trief as a witness in their interrogatory responses, in violation of the applicable rules and caselaw, Fed. R. Civ. P. 26, 33, 37, and avers that from at least 1994 forward, Plaintiff used tangible cues at Lavelle.  (Pl. Dep. Exh. 28; RB Aff. ¶ 6).

50.     Denies Paragraph 50, except admits that in January 2006 Plaintiff requested a re-evaluation (FS Dep. 144-5) and Mr. Simpson agreed to do so (RB Dep. 624-5), admits that later in the month of January 2006, Mr. Simpson changed Item 8 in the negative evaluation (Pl. Dep. Exh. 44; FS Dep. 120, 122) and added an addendum to the January 2006 evaluation  (Pl. Dep.

Exh. 51; FS Dep. 148-9), and avers that Mr. Simpson told Ms. Behringer that the January 2006

evaluation would be destroyed. (Compl. ¶ 35; Pl. Dep. Exh. 46; FS Dep. 140; RB Dep. 461, 624-

5).

51.    Admits Paragraph 51 and avers that on or about April 12, 2006, Lavelle issued a

performance evaluation to Plaintiff with higher performance ratings and which stated that the

overall rating was met expectations (Pl. Dep. Exh. 53; FS Dep. 124, 150-2), and admits that on

April 12, 2006, Defendants also issued a memorandum to Ms. Behringer praising her and

reappointing her for the 2006-2007 school year.  (Compl. ¶ 37; Pl. Dep. Exh. 54; Def. Dep. Exh.

33; Def. Dep. Exh. 34; RB Dep. 461-2, 625-8; FS Dep. 153).

52.    Denies Paragraph 52, except admits that when Plaintiff attended the Duffy

Arbitration, she told Mr. D'Andrea and Mr. Simpson that she is a recovering alcoholic and a

member of Alcoholics Anonymous  (Compl. ¶ 40; VD Dep. 57-60; RB Dep. 479-480;  FS Dep.

156-7, 160; DT Dep. 63-5, 102-6), avers that this was the first time she told them (FS Dep. 157-

8), admits that Mr. Simpson asked "what's that got to do with" the arbitration (RB Dep. 630-1),

and avers that, as Ms. Nanry advised EEOC, Ms. Nanry "did not believe Frank was aware that

Ronnie was a recovering alcoholic until sometime in about 2006 when told him as part of an

arbitration hearing...." (Pl. Dep. Exh. 66).  (See Point II-S below).

53.    Denies Paragraph 53 and avers that during Summer 2006 staff meetings, Mr.

Simpson screamed, pounded his fists, and verbally abused Ms. Behringer, causing her to cry,

avers that Mr. Simpson then verbally abused her for crying, avers that Ms. Tucker testified that

during those meetings, Mr. Simpson made Plaintiff cry and acted improperly, avers that this was

witnessed by Plaintiff, Ms. Tucker and Ms. Nanry, and avers that Mr. Simpson singled out

Plaintiff and yelled more at Plaintiff than other attendees. (Compl. ¶ 43; DT Dep. 33-34, 41-2 LN Dep. 15-6; RB Dep. 464, 487, 500-7, 628-9, 636-7).

54.    Denies Paragraph 54, except admits that during Summer 2006 staff meetings, Mr. Simpson screamed, pounded his fists, and verbally abused Ms. Behringer, causing her to cry, avers that Mr. Simpson then verbally abused her for crying and acted improperly.  (Compl. ¶ 43; DT Dep. 33-34, 41-2 LN Dep. 15-6; RB Dep. 464, 487, 500-7, 628-9, 636-7; see also FS Dep. 160-1, 163-4).

55.    Denies Paragraph 55, except admits that during Summer 2006 staff meetings, Mr. Simpson screamed, pounded his fists, and verbally abused Ms. Behringer, causing her to cry, avers that Mr. Simpson then verbally abused her for crying and acted improperly, avers that Mr. Simpson singled out Plaintiff and yelled more at Plaintiff than other attendees. (Compl. ¶ 43; DT Dep. 33-34, 41-2 LN Dep. 15-6; RB Dep. 464, 487, 500-7, 628-9, 636-7), and avers that Ms. Nanry and Ms. Tucker alleged in their depositions that Plaintiff was not "singled out."  (DT Dep. 106-7; LN Dep. 34-5).

56.    Denies Paragraph 56, except admits that in September 2006, at or about the beginning of the school year, Mr. Simpson maliciously said to Plaintiff words to the effect of "Oh, I see you are here.  I thought you would have quit," avers that Ms. Behringer replied that she had no intention of quitting, avers that Mr. Simpson's conduct was part of Mr. Simpson's ongoing discrimination, harassment, retaliation, and efforts to coerce Plaintiff's separation from Lavelle (Compl. ¶ 43; Pl. Dep. Exh. 62; RB Dep. 464, 487-8, 508-9; FS Dep. 167-8), and avers that  Defendants alleged in depositions that Mr. Simpson made similar comments to Ms. Nanry and Ms. Tucker (FS Dep. 167-89; DT Dep.  51-3; LN Dep. 36-7).

57.     Denies Paragraph 57, except admits that at the December 2006 Lavelle Christmas party, Mr. Simpson, aware that Ms. Behringer is a recovering alcoholic and has a disability, repeatedly and maliciously offered to get her alcohol, admits that Ms. Behringer declined, avers that Mr. Simpson offered alcoholic beverages to Plaintiff, knowing she is a recovering alcoholic, as part of his ongoing discrimination, harassment and retaliation against her, and in an ongoing effort to coerce her separation from Lavelle (Compl. ¶ 44; RB Dep. 482-3, 488, 509-11), avers that Mr. Simpson admits he offered Plaintiff a drink (FS Dep. 169), and avers that Defendants now allege that Mr. Simpson was functioning as a host.  (FS Dep. 169-70; LN Dep. 12, 25-6).

58.     Denies Paragraph 58, except admits that on or about January 3, 2007, Mr. Simpson gave Ms. Behringer an uncalled for "warning" regarding three alleged instances of failure to swipe out  (FS Dep. 172-3, 223-4, 233-4; RB Dep. 488-9) and refers to Defendants' records for their contents (Park Decl. Exh. 21, at DEF 306-7), avers that this was a further act of discrimination, harassment and retaliation (RB Dep. 488-9), avers that, as Plaintiff testified, this was a fabricated warning as it did not cover a period that Mr. Simpson generally tracked (RB Dep. 492, 495), and avers that an alleged 2008 evaluation of Ms. Nanry is no defense to Plaintiff's claims. (LN Dep. 8-9, 41-2).

59.     Denies Paragraph 59, except admits that on February 13, 2007, Plaintiff intervened when an incident took placed in the school gym involving a female student named "Destiny" (RB Dep. 390-1) and admits that also in the gym were Susan Kiley, Natasha Mousami, Karen Gerweck, Francis (Paco) Secada, and one or more male students (RB Dep. 392-4).  (Point II-V below).

60.     Denies Paragraph 60, except admits that Mr. Secada and one of his male students "were both looking at Destiny's ass" and avers that Ms. Behringer politely and repeatedly asked Paco to take his student (Orlando) out of the vicinity, refers to Plaintiff's complete testimony for its contents (Gerweck Aff. II ¶ 12; RB Dep. 391, 394-5, 403-4, 413, 418), avers that Plaintiff did not yell, scream or raise her voice to Mr. Secada (RB Dep. 411-12), avers that on February 13, 2007, Destiny was in the gym and was having a tantrum in the gym, and avers that during this tantrum, Destiny pulled down her pants and underwear (pull-up diaper) and her buttocks were visible. (RB Dep. 391, 405, 407; Gerweck Aff. II ¶ 5-6).

61.     In response to Paragraph 61, admits that Ms. Behringer spoke with Gary Wier (Transition Coordinator), who was Mr. Secada's supervisor, and refers to Plaintiff's complete testimony for its contents (RB Dep. 392, 401-2), avers that Ms. Behringer advised Gary Wier that Destiny's pants were down, her buttocks were visible, Mr. Secada and a student were too close to Destiny, and it had been necessary for her to ask Mr. Secada to move out of the vicinity of Destiny. (RB Dep. 392, 401-2, 409-10).

62.     Denies Paragraph 62, except admits that Plaintiff told Mr. Wier words to the effect of that when she first saw Destiny and the nurse in the gym, it initially looked like Destiny might be receiving a suppository, but that Plaintiff quickly realized that Destiny was only having a tantrum and was not actually receiving a suppository, and refer to Plaintiff's complete testimony for its contents (RB Dep. 402, 408, 411, 417-8).

63.     Denies Paragraph 63, avers that Mr. Wier indicated that he would discuss the matter with Mr. Secada (RB Dep. 392, 401-2, 410), avers that Mr. Wier believed that Mr. Secada

-14-

acted inappropriately in the gym and, on February 14, 2007, Mr. Wier sent an email to Plaintiff, stating:

> I wanted you to know that I had a follow-up discussion with Francis Secada concerning yesterday morning's confusion in the gym.  He claims he did not know what was going on with your student and he apologized for not recognizing that he should leave with his assigned students.  I suggested that he be protective of your students and his at all times and especially when using the gym......I would be glad to meet with you on this further should you like to do so.  Thank you, Gary.

(Pl. Dep. Exh. 58).

      64.     Denies Paragraph 64, except avers that Defendants allege that Mr. Secada sent an email to Mr. Wier, and refers to that alleged email for its contents.  (Def. Dep. Exh. 24).

      65.     Admits Paragraph 65 and avers that on February 14, 2007, Mr. Wier sent an email to Plaintiff, stating:

> I wanted you to know that I had a follow-up discussion with Francis Secada concerning yesterday morning's confusion in the gym.  He claims he did not know what was going on with your student and he apologized for not recognizing that he should leave with his assigned students.  I suggested that he be protective of your students and his at all times and especially when using the gym......I would be glad to meet with you on this further should you like to do so.  Thank you, Gary.

(Pl. Dep. Exh. 58), and avers that Plaintiff responded to the email and refer to Plaintiff's email for its complete contents.  (Pl. Dep. Exh. 58).

66.    Denies Paragraph 66, except admits that, according to the document containing Mr. Wier's February 14, 2007 email, Mr. Wier forwarded a copy of his February 14 email to Ms. Tucker. (Pl. Dep. Exh. 58).

67.    Denies Paragraph 67, except avers that according to Ms. Tucker, Susan Kiley, nurse, told her that Destiny had a tantrum and was pulling at her clothes and the top of her buttocks were exposed  (DT Dep. 81-2).

68.    Denies Paragraph 68, except admits that during Ms. Tucker's deposition, she alleged that she spoke with Mr. Wier.  (DT Dep. 83-5).

69.    Denies Paragraph 69, except admits that Mr. Wier provided Mr. Simpson with a copy of the February 14, 2007 email. (Pl. Dep. Exh. 58; FS Dep. 188-9).

70.    Denies Paragraph 70, except admits that Plaintiff may have mentioned the events of February 13, 2007 to Diane Tucker (see Point II-V below), and refers to Plaintiff's complete testimony for its contents. (RB Dep. 420, 422-4).

71.    Denies Paragraph 71, except admits that Plaintiff may have mentioned the events of February 13, 2007 to Diane Tucker (see Point II-V below), and refers to Plaintiff's complete testimony for its contents. (RB Dep. 420, 422-4).

72.    Denies Paragraph 72, except admits that during Ms. Tucker's deposition, she alleged that she spoke with Mr. Wier. (DT Dep. 83-5).

73.    Denies Paragraph 73, except avers that Mr. Simpson alleges he conducted an investigation, and admits that Mr. Simpson spoke with Plaintiff.  (RB Dep. 437-40, 442-3).

74.     Denies Paragraph 74 and avers that, according to Mr. Simpson, either Karen Gerweck or Natasha Mousami, who were both in the gym, told him that Destiny had pulled her pants down (FS Dep. 180-83; Pl. Dep. Exh. 57 at Bates DEF 1393; see also  Simpson Aff. ¶ 90), which is consistent with Plaintiff's statements.  (Gerweck Aff. II).

75.     Denies Paragraph 75 and avers that Mr. Wier believed that Mr. Secada acted inappropriately in the gym and, on February 14, 2007, Mr. Wier sent an email to Plaintiff, stating:

> I wanted you to know that I had a follow-up discussion with Francis Secada concerning yesterday morning's confusion in the gym.  He claims he did not know what was going on with your student and he apologized for not recognizing that he should leave with his assigned students.  I suggested that he be protective of your students and his at all times and especially when using the gym......I would be glad to meet with you on this further should you like to do so.  Thank you, Gary.

(Pl. Dep. Exh. 58), and avers that Mr. Secada and his male student were standing too close to and were facing Destiny.  (Gerweck Aff. II).

76.     Denies Paragraph 76 and avers that, according to Mr. Simpson, either Karen Gerweck or Natasha Mousami, who were both in the gym, told him that Destiny had pulled her pants down (FS Dep. 180-83; Pl. Dep. Exh. 57 at Bates DEF 1393; see also Gerweck Aff. II).

77.     Denies Paragraph 77, except admits that during Plaintiff's employment, a student named Danny did receive a rectal suppository from the nurse in the gym (RB Dep. 413-416), admits that Destiny had a tantrum in the gym (RB Dep. 391, 405, 407) rather than a seizure (RB

Dep. 418), avers that Plaintiff does not recall a student actually receiving a rectal suppository with five persons standing around (RB Dep. 417-20), and avers that a rectal suppository is not the appropriate response to a student tantrum.  (RB Dep. 420).

78.     Denies Paragraph 78 and avers that Plaintiff acted properly in the gym. (Gerweck Aff. II ¶ 1-13; see Point II-V below).

79.     Denies Paragraph 79, except admits that on or about February 26, 2007, at Mr. Simpson's request, Plaintiff discussed the events of February 13, 2007 with Mr. Simpson, avers that Plaintiff advised Mr. Simpson, among other items, that Destiny's buttocks were visible, that she asked Mr. Secada to move out of the vicinity, and that she advised Mr. Wier of the matter (RB Dep. 437-40, 442-3; see also FS Dep. 183-6, 230; Pl. Dep. Exh. 57 at DEF 1395-6), avers that Plaintiff had previously intervened in situations involving students and this was routine in the Lower School and essentially a "non event" (Gerweck Aff. II ¶ 8-13; RB Dep. 392, 420), avers that, as Plaintiff testified, Destiny's tantrum which was resolved quickly "was a non-incident...It was me doing my job.  Protecting my students", and avers that the matter was resolved in no more than 10 minutes which was not "a lot of time."  (RB Dep. 420-2).

80.     Denies Paragraph 80 and avers that Mr. Simpson targeted Plaintiff for termination after she exercised her FMLA rights, opposed, objected to and complained about violations of her FMLA rights, and disclosed she is a recovering alcoholic, and the "Destiny incident" was a pretext to cover up the unlawful motivation for firing her.  (Compl.; see Point II below).

81.     Admits Paragraph 81 and avers that Defendants' alleged reason for firing Plaintiff is false and is a pretext for unlawful termination of her employment.

82.     Admits Paragraph 82.

83.     Admits Paragraph 83.

84.     Denies Paragraph 84, avers that Plaintiff did not file any "false report" that Mr. Secada was staring at a naked student receiving a rectal suppository, and avers that if such a "false report" had been filed, it would be grounds for termination.  (RB Aff. ¶ 3-4; RB Dep. 450).

85.     Denies Paragraph 85, except admits that Mr. Simpson issued policies (FS Dep. 36-7; Pl. Dep. Exh. 23) and refers to those policies for their contents.

86.     Denies Paragraph 86, avers that to the extent any non-Principals took FMLA leave and are not recovering alcoholics, such event is no defense to Plaintiff's claims, avers that Defendants' alleged non-discriminatory treatment of another employee is no defense to Plaintiff's claims, and avers that Defendants did not disclose such alleged data during discovery.

87.     Denies Paragraph 87, avers that to the extent any non-Principals took FMLA leave and are not recovering alcoholics, such event is no defense to Plaintiff's claims, avers that Defendants' alleged non-discriminatory treatment of another employee is no defense to Plaintiff's claims, and avers that Defendants did not disclose such alleged data during discovery.

## POINT II

## ADDITIONAL FACTS PURSUANT TO RULE 56.1(b)

A.                                INTRODUCTION

88.     Plaintiff Eleanor ("Ronnie") Behringer ("Plaintiff" or "Ms. Behringer") alleges that Defendants Lavelle School For The Blind ("Lavelle" or the "School") and Frank Simpson ("Mr. Simpson"), Superintendent of Lavelle, unlawfully discriminated against, retaliated against and discharged her after she sought protected FMLA leave to care for her ailing father and after she disclosed to Mr. Simpson that she is a recovering alcoholic.  (Compl. ¶ 1, 2; Pl. Dep. Exh.

16; Def. Dep. Exh. 16; RB Dep. 213).  Plaintiff incorporates the allegations of the Complaint. (RB Dep. 633).

89.     As detailed in Plaintiff's memorandum of law, her claims arise under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 et seq., the New York State Human Rights Law, N.Y. Exec. L. § 290 et seq. and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 et seq. (Compl. ¶ 3; RB Dep. 209-212, 214, 335, 336-341, 456, 458-9, 466-7, 479, 482-6, 637-8).

**B.**            **PLAINTIFF'S EMPLOYMENT WITH DEFENDANTS**

90.     Plaintiff was employed by Lavelle for approximately 17 years, from 1990 through February 28, 2007.  Her final position was Lower School Principal. (Pl. Dep. Exh. 59; RB Dep. 309, 376-385; Compl. ¶ 14).  As Principal, Plaintiff's duties included, among other items, provide guidance, support and supervision to Program Directors, responsibility for the safety and welfare of the students.  (Pl. Dep. Exh. 21; Pl. Dep. Exh. 22; DT Dep. 18-19).

91.     Lavelle has students that exhibit various behaviors, including tantrums, biting, removing clothing, etc.  Some students receive medication at Lavelle.  It is a priority for each Principal to ensure the safety of the students.  A Principal is authorized to intervene in student situations and to give instructions to other staff.  This was routine at Lavelle. (DT Dep. 8-10, 14-18; LN Dep. 10; Gerweck Aff. II).

92.     When Plaintiff was Lower School Principal, Dianne Tucker was Upper School Principal and Lorrie Nanry was Preschool Principal.  (DT Dep. 6; LN Dep. 5-6).  The Principals covered for each other during absences.  (DT Dep. 50, 63; RB Dep. 530, 545).

93.     Dianne Tucker, Upper School Principal for about the past six years, has intervened in student situations to protect the student and gave instructions to staff.  (DT Dep. 6, 17-18).

## C.                    PLAINTIFF'S JOB PERFORMANCE

94.     Ms. Behringer was qualified for her position with Lavelle and established a track record of outstanding job performance.  For years, Lavelle repeatedly issued written performance evaluations to Ms. Behringer, stating that her overall job performance was "excellent" or "met expectations."   For example, in May 2001, Lavelle issued an evaluation to Ms. Behringer stating, among other items:

  a.     "She is a conscientious and dependable person";

  b.     "Ronnie has met the on-going challenge of serving as principal at Lavelle";

  C.     "Ms. Behringer is an effective principal who fosters relationships with her peers, the students and their families"; and

  d.     "It has been a great pleasure working with Ronnie and watching her develop into a great (leader) principal in such a challenging environment".

(Compl. ¶ 15, 25; Pl. Dep. Exh. 2 at Bates Number DEF 00740-2; Compl. ¶ 22; see also Goldberg Cert., Exh. L; see also Pl. Dep. Exh. 53).

95.     During Ms. Behringer's employment with Lavelle, Lavelle repeatedly reappointed Ms. Behringer and gave her raises.  (Compl. ¶ 16, 28, 23; FS Dep. 70; Pl. Dep. Exhs. 27, 28, 54).

96.     During Ms. Behringer's employment with Lavelle, Ms. Behringer received correspondence praising her performance.  For years, Sister Angelus Healy, OP, then

Superintendent, gave Ms. Behringer documents recognizing Ms. Behringer's outstanding job performance.  (Pl. Dep. Exh. 2; Compl. ¶ 24).  Other documents were similarly prepared praising Plaintiff.  (Goldberg Cert., Exhs. K, M, P).

97.    Maureen Lizarazo, Administrative Assistant, documented Plaintiff's outstanding job performance.  (Pl. Dep. Exh. 3).

D.              **PLAINTIFF IS A RECOVERING ALCOHOLIC**

98.    Ms. Behringer is a recovering alcoholic and a member of Alcoholics Anonymous. Ms. Behringer requires and receives ongoing treatment from Alcoholics Anonymous and is a member of Alcoholics Anonymous.  (Compl. ¶ 17; RB Dep. 102-103, 115; Goldberg Cert., Exhs. O, P).  Certain of Plaintiff's medical documents reference her alcoholism and "alcoholism secondary to sever[e] depression."  (RB Dep. 147; Def. Dep. Exh. 9 at Bates Number DEF00470 ("alcoholism secondary to sever[e] depression"); Goldberg Cert., Exhs. J, N).

99.    In 1993, Ms. Behringer, then a teacher at Lavelle, was hospitalized and on disability leave for alcoholism and related medical conditions.  At the time, Ms. Behringer suffered from an addiction to and dependence on alcohol.  Her alcoholism is an impairment that substantially limited one or more major life activities, including working.  (Compl. ¶ 18; RB Dep. 106-08, 143-44, 146-8, 155, 159-62; Def. Dep. Exh. 8; Def. Dep. Exh. 9).

100.    Ms. Behringer returned to work at Lavelle in the Fall of 1993.  She was subsequently promoted to Program Supervisor for the 1994 school year.  Since her discharge from the hospital in May 1993, Ms. Behringer has been and is a recovering alcoholic.  (Compl. ¶ 19; (RB Dep. 147; Def. Dep. Exh. 9 at Bates Number DEF00470; Goldberg Cert., Exhs. J, N; Pl. Dep. Exh. 9, EEOC Charge ¶ 1-4).

101.    Ms. Behringer has a "disability."  Notably, Ms. Behringer, a recovering alcoholic, has an undisputed history and record of alcoholism that previously substantially limited her major life activities, including working.  (Compl. ¶ 19, 21 RB Dep. 147; Def. Dep. Exh. 9 at Bates Number DEF00470; Goldberg Cert., Exhs. J, N; Pl. Dep. Exh. 9, EEOC Charge ¶ 1-4).

102.    Sister Angelus Healy (then Principal of Lavelle) and Sister Louis Marie Baxter (then Superintendent of Lavelle), were aware of Ms. Behringer's hospitalization, medical condition and disability.  (Compl. ¶ 20; RB Dep. 111-5; Pl. Dep. Exh. 9).  Plaintiff told Ms. Tucker and Ms. Nanry that she is a recovering alcoholic and they kept it confidential.  (DT Dep. 61; LN Dep. 11, 13; RB Dep. 111-5).

E.          **FRANK SIMPSON JOINED LAVELLE IN 2001 AND**

        **FOR YEARS GAVE PLAINTIFF POSITIVE PERFORMANCE EVALUATIONS**

103.    During 2001, Lavelle hired Frank Simpson as Superintendent.  Mr. Simpson succeeded Sister Angelus Healy and he became Ms. Behringer's direct supervisor.  (Compl. ¶ 26; FS Dep. 12-14, 32-34; RB Dep. 222-3).  Ms. Behringer reported to Mr. Simpson from 2001 until her discharge in 2007.  (FS Dep. 17).

104.    Mr. Simpson was the highest authority at Lavelle.  (FS Dep. 192).  Mr. Simpson had authority to hire and fire.  According to Mr. Simpson, he made the decision to fire Plaintiff.  (FS Dep. 34).  Defendant Simpson reported to Lavelle's Board of Trustees, the head of which was and is Brother James Kearney. (Compl. ¶ 27; FS Dep. 15).

105.    In his first year of employment, Mr. Simpson reviewed Plaintiff's personnel file and saw positive performance evaluations of Plaintiff.  (FS Dep. 41-3).

106.     Plaintiff was employed year to year basis.  (FS Dep. 27-8, 68-9).  According to

Mr. Simpson, he had the authority to fire her at any time.  (FS Dep. 71).  Mr. Simpson renewed

Plaintiff's employment each year and for each School year through her discharge.  According to

Mr. Simpson, in order for Plaintiff's employment to be renewed, she had to be performing

satisfactorily and Mr. Simpson reviewed Plaintiff's performance evaluation in deciding to renew

her employment.  (FS Dep. 29-31, 71).  Mr. Simpson issued reappointment notices to Plaintiff.

(FS Dep. 70).

107.     On or about January 11, 2002, Mr. Simpson issued a memorandum to Ms.

Behringer stating, among other items:   "Overall, your work rating thus far this year is excellent

and the school is very fortunate to have you as a key administrator." (Compl. ¶ 29; Pl. Dep. Exh.

26; FS Dep. 48).

108.     In April 2002, Mr. Simpson gave Plaintiff a letter renewing her employment. He

stated "I congratulate you on your work and hope you continue to perform at this exceptional

level."  (Pl. Dep. Exh. 27; FS Dep. 48-9, 67-8).

109.     In August 2002, Lavelle issued a letter to Ms. Behringer praising her for her

outstanding job performance and giving her a raise of $5,000 retroactive to September 1, 2001.

(Compl. ¶ 30; Pl. Dep. Exh. 28).   The letter, signed by Mr. Simpson, stated "The Board of

Trustees recognizes your expertise and commitment to excellence that is reflected in your work."

(Pl. Dep. Exh. 28; FS Dep. 49-50).

110.     In or about October 2003, Plaintiff received an evaluation stating "Ms.

Behringer's overall rating for 2002-2003 is Met Expectations."  Mr. Simpson wrote the

"summary" section.  (Pl. Dep. Exh. 30; FS Dep. 66-7; <u>see also</u> Pl. Dep. Exh. 29).

111.    On November 7, 2003, Defendants issued a memorandum to Plaintiff confirming

that as of October 27, 2003, her position was now Principal of Lower School.  (Pl. Dep. Exh. 31;

FS Dep. 67.  At that time, Ms. Tucker became Upper School Principal and Ms. Nanry became

Preschool Principal and all three Principals reported to Mr. Simpson.  (DT Dep. 6; LN Dep. 5-6;

FS Dep. 92).

112.    In January 2005, Lavelle issued an evaluation to Ms. Behringer, for the period

September 2003 to December 2004, stating that her overall rating was "Met Expectations."

(Compl. ¶ 32; Pl. Dep. Exh. 32; FS Dep. 72-3).

**F.      IN 2005 PLAINTIFF TOOK FMLA LEAVE TO CARE FOR HER FATHER**

**AND FRANK SIMPSON VIOLATED HER FMLA RIGHTS**

113.    In April 2005, Plaintiff's father, residing in Grand Bahama Island, was diagnosed

with terminal lung cancer.  (RB Dep. 531-33, 541).

114.    Ms. Behringer exercised her legal right to take protected leave under the FMLA to

care for her ailing father.  In May 2005, Plaintiff submitted forms applying for FMLA leave on an

intermittent basis.  (Pl. Dep. Exh. 34; FS Dep. 74-7; RB Dep. 513-519, 524-5; Def. Dep. Exh.

25; Def. Dep. Exh. 26).  The request was purportedly "approved." (RB Dep. 523-5).  According

to Mr. Simpson, Plaintiff was entitled to FMLA leave. (Simpson Aff. ¶ 43-44).

115.    Plaintiff's father saw Dr. Youn Suk Yi, then Dr. Stefan Gorsch.  Plaintiff

submitted a doctor's note from Dr. Yi.  (RB Dep. 519-22; Def. Dep. Exh. 27; Def. Dep. Exh. 30).

116.    Mr. Simpson knew that Plaintiff's father had cancer and that Plaintiff was taking

FMLA leave.  (FS Dep. 95-6).  Plaintiff cried when discussing her father's condition.  (DT Dep.

110-111).

117.    Ms. Tucker was aware that Plaintiff was taking FMLA leave to care for her ill father.  (DT Dep. 61-2, 121).  Ms. Tucker and Ms. Nanry covered for Plaintiff during her leave.  (DT Dep. 115, 121; LN Dep. 13; RB Dep. 530, 545).  They did not question Plaintiff's FMLA leave. (DT Dep. 118; LN Dep. 38).  Ms. Tucker never complained about Plaintiff. (DT Dep. 55).

118.    From May through November 2005, Plaintiff took intermittent FMLA leave, never exhausted her FMLA leave entitlement, and took far less days than she was entitled to. (Pl. Dep. Exh. 35; Pl. Dep. Exh. 36; Def. Dep. Exhs. 25 to 31; FS Dep. 79-80, 85). She used her FMLA days to provide care to her father.  (RB Dep. 538-545, 549, 552-3, 608-9, 638-40).

119.    After Plaintiff took protected FMLA leave, Mr. Simpson abused Plaintiff and treated her with hostility.  (RB Dep. 336, 341, 354-366, 457, 460, 600-1).  Mr. Simpson discriminated against and retaliated against Ms. Behringer for her FMLA leave.

120.    He gave Plaintiff assignments and when she completed them he forced her to redo them alleging he did not give the instructions she had followed.  (RB Dep. 367-8).

121.    He made Plaintiff redo schedules.  (RB Dep. 366).

122.    He intentionally ignored Plaintiff and was not friendly towards her. (RB Dep. 369, 372-3).

123.    When Plaintiff notified Defendants that she was taking FMLA days, Mr. Simpson excessively questioned her about which days she was traveling and, as Plaintiff stated, Mr. Simpson "gave me a rough time about being out of school."  (RB Dep. 457).

124.    In November 2005, Plaintiff took protected FMLA leave to travel to the Bahamas and care for her dying father, ultimately bringing him back to the United States for final chemotherapy treatments prior to his death.  (RB Dep. 553-5).

-26-

125.    Dr. Steven Gorsch, who had been treating Plaintiff's father, advised her to make

this trip.  (RB Dep. 562-3).  During this FMLA leave, Plaintiff provided care to her father,

including among other items helping him get his affairs in order and get medications, making

arrangements relating to the event of his passing, and bringing him to see Dr. Gorsch in

November 2005.  (RB Dep. 562-3, 567-8, 572-80, 590-1; Def. Dep. Exh. 30).

126.    On Saturday, November 5, 2005, while Plaintiff was in the Bahamas, she spent

less than two hours participating in a triathlon, as a form of personal exercise.  Other family

members that had traveled to visit with Plaintiff's father one last time before his death, also

participated.  (RB Dep. 555-61, 537, 567-568; Def. Dep. Exh. 29; Pl. Dep. Exh. 39).

127.    When Plaintiff returned from her protected FMLA leave, and on or about

November 21, 2005, Mr. Simpson confronted her with false and harassing allegations regarding

her FMLA leave, demanding an explanation for Plaintiff's use of non FMLA days and the timing

of her plane ticket purchase and registration for the November 5 event.  (FS Dep. 86-87; RB Dep.

581-3, 587-90; see also Pl. Dep. Exh. 37).

128.    On or about November 23, 2005, Mr. Simpson issued a memorandum to Plaintiff,

placing a memorandum in her personnel file, raising false and harassing allegations about her

FMLA leave and violating her rights under the FMLA.  Mr. Simpson essentially falsely accused

Ms. Behringer of abusing her FMLA leave when she participated in a triathlon on a Saturday

(November 5, 2005), a non-FMLA day.  He unlawfully demanded an accounting of Plaintiff's

activities on a Saturday, which was a non-FMLA day. (Compl. ¶ 32; Pl. Dep. Exh. 5; Pl. Dep.

Exh. 38; FS Dep. 88-90; RB Dep. 581-7, 591-2, 599-602).

129.    As Plaintiff stated, "In the fall of '05 he wrote me up for exercising on a Saturday after trolling the Internet to see what I was doing on weekends" (RB Dep. 460-1).  Mr. Simpson advised Plaintiff that she could not use FMLA days for days when she traveled to and from her dying father, including November 2, 3 and 18.  (RB Dep. 593-4, 596-7).  Plaintiff considered Mr. Simpson's actions to be discrimination, harassment and retaliation.  (RB Dep. 606-8).  Mr. Simpson did not have any legitimate basis for his conduct.

130.    Defendants admit that (a) Plaintiff did not work Saturdays, (b) her running a triathlon on a Saturday did not count as usage of FMLA leave, and (c) there was nothing improper about Plaintiff running a triathlon on November 5, 2005.  (FS Dep. 97-8, 101; RB Dep. 590).  Mr. Simpson knew the triathlon was a non-FMLA day because, as he testified, during Plaintiff's FMLA leave, he downloaded information from the Internet showing that on Saturday, November 5, 2005, Plaintiff ran a triathlon. (FS Dep. 90-91; Pl. Dep. Exh. 39; FS Dep. 99-101).

131.    Defendants admit that Plaintiff did not exhaust her FMLA leave.  According to Mr. Simpson, in November 2005, he reviewed Defendants' records for Plaintiff's FMLA usage, and knew she did not exhaust her FMLA days.  (Pl. Dep. Exh. 35, Bates P0099, P0100 and P0101; FS Dep. 81-4, 99).

132.    According to Mr. Simpson, Lavelle applied holidays to Plaintiff's FMLA usage. (FS Dep. 98).

133.    On or about December 15, 2005, Plaintiff filed a written complaint with Mr. Simpson regarding his violation of her FMLA rights.  She complained, among other items, that Mr. Simpson was unlawfully charging her FMLA days on non-work days.  (Compl. ¶ 33; Pl.

Dep. Exh. 6; Pl. Dep. Exh. 40; FS Dep. 102-104; RB Dep. 602-6).  Plaintiff responded to Mr.

Simpson's November 23, 2005 memorandum.  (RB Dep. 607-8; Pl. Dep. Exh. 6).

134.     According to Mr. Simpson, he forwarded Plaintiff's written complaint to outside

counsel Vincent D'Andrea, Esq.  (FS Dep. 103-6).  Based on Mr. D'Andrea's time records, he

discussed the matter with Mr. Simpson on or about December 17, 2005.  (Pl. Dep. Exh. 13; FS

Dep. 216-9).

135.     On or about December 21, 2005, Ms. Behringer complained to Mr. D'Andrea that

Defendant Simpson was "fucking with my FMLA days and I have a labor lawyer."  (Pl. Dep.

Exh. 4; Pl. Dep. Exh. 41;  FS. Dep. 106-8; VD Dep. 24-7).  As Plaintiff testified, Mr. Simpson's

actions made Plaintiff feel "very uncomfortable" taking any days off, as she was placed in fear of

disciplinary action by Mr. Simpson.  (RB Dep. 609-10).

136.     Mr. D'Andrea reported Plaintiff's verbal complaint of December 21, 2005 to

Defendant Simpson.  Defendants did not investigate or take any remedial action regarding

Plaintiff's FMLA complaints and no one got back to Ms. Behringer about her protected

complaints.  (FS Dep. 107-8, 110-12; VD Dep. 27-8, 32-3).

137.     Mr. Simpson's conduct from the time Plaintiff took FMLA leave through her

termination created a hostile work environment. (RB Dep. 336-341).  Plaintiff advised co-

workers that Mr. Simpson was seeking to coerce her resignation.  (Goldberg Cert., Exh. O).

**G.       IN JANUARY 2006 SIMPSON RETALIATED AGAINST PLAINTIFF**

**BY GIVING HER A NEGATIVE PERFORMANCE EVALUATION**

138.     In early January 2006, Lavelle asked Ms. Behringer to submit a self-evaluation.

(Pl. Dep. Exh. 43; FS Dep. 120-4).

139.    On or about January 7, 2006, Mr. Simpson and Lavelle's attorney, Mr. D'Andrea discussed Ms. Behringer, as shown by Mr. D'Andrea's attorney time sheets.  (Pl. Dep. Exh. 13 at Bates Number DEF 01051; VD Dep. 50, 53-4; RB Dep. 464-5). According to Mr. D'Andrea, he knew Plaintiff since she was a Principal at Lavelle and "found no fault in her performance."  (VD Dep. 16).  Mr. D'Andrea also said "I thought Behringer did a good job."  (VD Dep. 33).

140.    On or about January 9, 2006, Plaintiff submitted a self-evaluation and list of accomplishments.  (Pl. Dep. Exh. 43; FS Dep. 120-4).

141.    Mr. Simpson then issued a performance evaluation to Ms. Behringer raising false criticisms of her job performance, defaming her, and falsely alleging that her performance was "below expectations."  Ms. Behringer's job performance was, in fact, exemplary.  Mr. Simpson did so as an act of discrimination, harassment and retaliation for Plaintiff's protected FMLA complaints. (Compl. ¶ 34; Pl. Dep. Exh. 45; FS Dep. 120-1, 124-5; RB Dep. 611-13, 628).

142.    According to Mr. Simpson, Plaintiff's job was placed at risk. (FS Dep. 138).  As Plaintiff stated, "In January '06 he wanted to get rid of me so badly he wrote an evaluation of me that, essentially, was false."  (RB Dep. 461).

143.    On or about January 12, 2006, Ms. Behringer submitted a written complaint to Mr. Simpson regarding the January 2006 evaluation.  Mr. Simpson told Ms. Behringer that the evaluation would be destroyed, but apparently retained the document.  (Compl. ¶ 35; Pl. Dep. Exh. 46; FS Dep. 140; RB Dep. 461, 624-5; see also Pl. Dep. Exh. 47; FS Dep. 141-3).

144.    According to Mr. Simpson, on or about January 19, 2006, Plaintiff met with Mr. Simpson.  (FS Dep. 144-5).

145.   Later that month, Mr. Simpson changed Item 8 in the negative evaluation to a "met expectations" (Pl. Dep. Exh. 44; FS Dep. 120, 122) and added an addendum to the evaluation.  (Pl. Dep. Exh. 51; FS Dep. 148-9).

146.   The negative performance evaluation criticized Plaintiff's telephone usage, which included making calls relating to her father and his medical condition.  (Pl. Dep. Exh. 44, Item 4; FS Dep. 130).  This criticism was a pretext for discrimination, harassment and retaliation.  Mr. Simpson, Ms. Nanry and Ms. Tucker all made personal telephone calls without repercussion. (FS Dep. 133-4).  Plaintiff had permission to make the telephone calls and she reimbursed Lavelle for the calls.  (Pl. Dep. Exh. 42; FS Dep. 113-4; RB Aff. ¶ 5).

**H.**       **PLAINTIFF'S FATHER DIED FEBRUARY 28, 2006**

147.   In February 2006, Ms. Behringer again took protected FMLA leave to care for her ailing father and, on February 28, 2006, he died.  Mr. Simpson was advised of same.  Mr. Simpson, in a further act of discrimination and retaliation, demanded that Ms. Behringer provide him with a death certificate for her father, under the guise that he needed that document to support her bereavement leave.  Ms. Behringer complied with the request.  (Compl. ¶ 36; RB Dep. 617-23; Pl. Dep. Exh. 35 at Bates Number P0711; Def. Dep. Exh. 32; FS Dep. 154).

**I.**        **IN APRIL 2006, SIMPSON GAVE PLAINTIFF**

            **A NEW EVALUATION AND REAPPOINTED HER**

148.   On or about April 12, 2006, Lavelle issued a performance evaluation to Plaintiff with higher performance ratings.  The evaluation stated that the overall rating was met expectations.  (Pl. Dep. Exh. 53; FS Dep. 124, 150-2).  According to Mr. Simpson, the evaluation

was for the period January to April 2006 and Plaintiff was satisfactorily performing her duties when she received the evaluation in April 2006.  (FS Dep. 152).

149.    On April 12, 2006, Defendants also issued a memorandum to Ms. Behringer praising her and reappointing her for the 2006-2007 school year, stating:

> "Based on your job performance, professionalism, and commitment to providing excellent educational services to Lavelle School Students, you are reappointed for the 2006-07 school year."

(Compl. ¶ 37; Pl. Dep. Exh. 54; Def. Dep. Exh. 33; Def. Dep. Exh. 34; RB Dep. 461-2, 625-8; FS Dep. 153).

150.    According to Mr. Simpson, as of April 12, 2006, Plaintiff was in good standing, her job was not in jeopardy, and she was performing at the level of meets expectations.  (FS Dep. 38, 153-4).

151.    The evaluation and re-appointment letter of April 2006  came in the aftermath of Mr. Simpson conferring with Lavelle's attorney regarding Plaintiff. (RB Dep. 464).

## J.    IN JUNE 2006, PLAINTIFF TOLD SIMPSON SHE IS A RECOVERING ALCOHOLIC AND THIS IS WHEN HE FIRST LEARNED THAT FACT

152.    In the Spring of 2006, Ms. Behringer was preparing to testify for Lavelle in an arbitration brought by Elizabeth Duffy, a former Teacher Assistant at Lavelle and a union member ("Duffy arbitration").  (Compl. ¶ 38; FS Dep. 155-6; Pl. Dep. Exh. 1).

153.    Ms. Behringer attended meetings to prepare for her testimony in the Duffy arbitration.  These meetings were attended by Vincent D'Andrea, Esq., who was Lavelle's

attorney, Mr. Simpson, Lorrie Nanry (pre-school Principal at Lavelle) and/or Diane Tucker (upper school Principal at Lavelle).  (Compl. ¶ 39; Pl. Dep. Exh. 1; FS Dep. 156).

154.    According to Defendants, the Duffy arbitration hearing dates were March 27, 2006, June 1, 2006 and June 23, 2006.  According to Defendants, Plaintiff attended the June 23, 2006 hearing in the Duffy Arbitration. (VD Dep. 8-9; Pl. Dep. Exh. 1).

155.    When Plaintiff attended the Duffy Arbitration, which according to Defendants was in June 2006, she told Mr. D'Andrea and Mr. Simpson that she is a recovering alcoholic and a member of Alcoholics Anonymous.  (Compl. ¶ 40; VD Dep. 57-60; RB Dep. 480;  FS Dep. 156-7, 160; DT Dep. 63-5, 102-6). That was the first time she told him.  (FS Dep. 157-8).  Mr. Simpson asked "what's that go to do with" the arbitration. (RB Dep. 630-1).

156.    Prior to Plaintiff's 2006 disclosure of her recovering alcoholic status to Mr. Simpson, Mr. Simpson knew nothing of Plaintiff's medical condition.  He did not read any medical documents about Plaintiff and knew nothing of her medical condition from her file.  He never discussed that with Plaintiff. (FS Dep. 52-8, 209).  Mr. Simpson did not discuss Plaintiff's medical condition or history with anyone at Lavelle when she worked there.  (FS Dep. 64-5).

157.    At some point by about 2002, Plaintiff told Mr. Simpson words to the effect of "I don't drink." (RB Dep. 288-9).  This is completely different from stating "I am a recovering alcoholic."  (RB Dep. 113-29, 632-3).  Mr. Simpson never told Plaintiff that he thought she was a recovering alcoholic.  (RB Dep. 295).  Plaintiff did not mention her AA meetings to Mr. Simpson.  (RB Aff. ¶ 2).  Mr. Simpson never asked Plaintiff about "meetings."  (FS Dep. 62-4).

**K.      THEREAFTER, SIMPSON TARGETED PLAINTIFF FOR RESIGNATION AND/OR DISCHARGE WITH A SERIES OF UNLAWFUL ACTS AGAINST HER**

158.    During 2006 and 2007, and before unlawfully terminating Ms. Behringer, Mr. Simpson engaged in various acts of unlawful discrimination, harassment and retaliation against Ms. Behringer, based on her disability and exercise of protected statutory rights under FMLA, to compel her resignation from Lavelle. Mr. Simpson unlawfully sought to terminate Ms. Behringer's employment because she had sought FMLA leave to care for her father and because of her disability.  (Compl. ¶ 41-42; RB Dep. 480-1).

**L.                      SUMMER 2006 STAFF MEETINGS**

159.    In the Summer of 2006 and in July and August 2006, Mr. Simpson held staff meetings with Plaintiff, Ms. Tucker and Ms. Nanry.  (DT Dep. 106-110; FS Dep. 160-1). Plaintiff participated in and spoke at these meetings.  (DT Dep. 31, 51).  Ms. Tucker took notes at the meetings.  (DT Dep. 24-51; Pl. Dep. Exh. 62).

160.    During these staff meetings, Mr. Simpson screamed, pounded his fists, and verbally abused Ms. Behringer, causing her to cry.  He then verbally abused her for crying. This was witnessed by Plaintiff, Ms. Tucker and Ms. Nanry.  Ms. Tucker testified that during those meetings, Mr. Simpson made Plaintiff cry and acted improperly.  Mr. Simpson singled out Plaintiff and yelled more at Plaintiff than other attendees. (Compl. ¶ 43; DT Dep. 33-34, 41-2 LN Dep. 15-6; RB Dep. 464, 487, 500-7, 628-9, 636-7). Mr. Simpson admits that he got loud and yelled and that Plaintiff cried.  (FS Dep. 160-1, 163-4).

161.    According to Mr. Simpson, Plaintiff was in good standing as of the Summer of 2006.  (FS Dep. 166-7).

M.                       <u>START OF FALL 2006 SEMESTER</u>

162.    Mr. Simpson next saw Plaintiff in September 2006, at or about the beginning of

the school year.  At that time, Mr. Simpson maliciously said words to the effect of "Oh, I see you

are here.  I thought you would have quit."  Ms. Behringer replied that she had no intention of

quitting.  This was part of Mr. Simpson's ongoing discrimination, harassment, retaliation, and

efforts to coerce Plaintiff's separation from Lavelle. (Compl. ¶ 43; RB Dep. 464, 487-8, 508-9;

FS Dep. 167-8).

163.    According to Mr. Simpson, Plaintiff was in good standing as of the Fall of 2006.

(FS Dep. 169).

N.                       <u>2006 CHRISTMAS PARTY</u>

164.    In December 2006, Lavelle held a Christmas party.  Mr. Simpson, aware that Ms.

Behringer is a recovering alcoholic and has a disability, repeatedly and maliciously offered to get

her alcohol.  Ms. Behringer declined.  Mr. Simpson offered alcoholic beverages to Plaintiff,

knowing she is a recovering alcoholic, as part of his ongoing discrimination, harassment and

retaliation against her, and in an ongoing effort to coerce her separation from Lavelle. (Compl. ¶

44; RB Dep. 482-3, 488, 509-11). Mr. Simpson admits he offered Plaintiff a drink.  (FS Dep.

169).

165.    Mr. Simpson admits that he offered drinks to other staff and got them alcoholic

beverages. (LN Dep. 12; FS Dep. 170).

166.    Mr. Simpson admits that he drinks alcohol.  (FS Dep. 64). He admits that

members in his family had drinking problems. (FS Dep. 62-3).  He admits that he drank alcohol

at the 2006 Christmas party. (FS Dep. 170). In fact, Mr. Simpson was visibly drunk at the 2006

Christmas party.  (RB Dep. 482-3, 511-12). As Plaintiff testified, Mr. Simpson had a problem

with alcohol.  Mr. Simpson told Plaintiff that he had problems with alcohol, his wife almost

threw him out of the house for his drinking, and his wife supervised his drinking.  (RB Dep. 480-

482).

167.    According to Mr. Simpson, Plaintiff was in good standing as of the Christmas

party 2006.  (FS Dep. 171).

**O.**              **JANUARY 2007 UNCALLED-FOR WARNING**

168.    On or about January 3, 2007, Mr. Simpson gave Ms. Behringer an uncalled for

"warning" regarding three instances of failure to swipe out.  (FS Dep. 172-3, 223-4, 233-4).  This

was a further act of discrimination, harassment and retaliation.  (RB Dep. 488-9).  As Plaintiff

testified, this was a fabricated warning as it did not cover a period that Mr. Simpson generally

tracked, and it was not for "punching out."  (RB Dep. 492, 495).

169.    Ms. Behringer went to Mr. Simpson's office, where personnel files were stored,

and asked to review her personnel file.  She was entitled to review her file.  (RB Dep. 488; FS

Dep. 172, 175).

170.    Maureen Lizarazo, Administrative Assistant to Mr. Simpson, told Ms. Behringer

that Mr. Simpson was "out" searching for her personnel file.  Mr. Simpson then told Ms.

Behringer that her file had been "lost."  This was the first time in Plaintiff's career that a

personnel file was lost and it occurred at a time when she needed to see her file.  Mr. Simpson

was responsible for maintaining the files.  (Compl. ¶ 45, 46; RB Dep. 488, 496-9).

171.    On January 5, 2007, Lavelle issued a memo to Ms. Behringer alleging that Tom

Hanney, Security Director, would investigate her "missing" personnel file.  (Pl. Dep. Exh. 55; FS

Dep. 171).  Lavelle never issued any subsequent documents to Ms. Behringer regarding any

alleged investigation.  On January 9, 2007, Ms. Behringer submitted to Lavelle various

documents that she had, in an effort to reconstruct her personnel file.  (Compl. ¶ 47; Pl. Dep.

Exh. 56; RB Dep. 499; FS Dep. 175-6).

**P.**                                      **OTHER INCIDENTS**

172.    From the Fall of 2006 forward, Mr. Simpson was rude to Plaintiff.  He would

enter a room and not acknowledge Plaintiff.  This occurred more than 50 times.  He spoke to

Plaintiff in a condescending, threatening tone.  This occurred about 90 times.  He treated her with

contempt about 10 or 15 times.  He also gave her assignments, then told Plaintiff he did not give

the assignment in the manner previously dictated.  (RB Dep. 467-77).

**Q.**                              **TERMINATION OF EMPLOYMENT**

173.    On February 28, 2007, the anniversary of the death of Ms. Behringer's father,

Defendants suddenly and unlawfully discharged Ms. Behringer's employment.   (Compl. ¶ 48,

52; Pl. Dep. Exh. 59; RB Dep. 309, 376-385).  Defendants issued a termination memorandum to

Ms. Behringer, dated February 28, 2007, falsely stating: "Your behavior in the work environment

is unacceptable."  (Compl. ¶ 49; Pl. Dep. Exh. 59; Def. Dep. Exh. 20; FS Dep. 193-4).

According to Mr. Simpson, he fired Plaintiff "for inappropriate and unacceptable behavior for a

Lavelle employee."  (FS Dep. 176-7).  This was baseless. (Compl. ¶ 50).

174.    Plaintiff asked Mr. Simpson to explain the allegations in the termination letter and

he refused to do so.  (RB Dep. 376-385).

175.    Defendants did not fire Plaintiff in consultation with counsel.  In fact, Mr.

D'Andrea only learned of the termination after the fact.  (VD Dep. 63).

176.     Ms. Lizarazo and Mr. Hanney were present at the time of Ms. Behringer's discharge.  Mr. Hanney escorted Ms. Lavelle to her office and then out of the building, which was extremely demeaning, degrading and defamatory to her reputation.  (Compl. ¶ 51).

177.     According to Ms. Tucker and Ms. Nanry, Mr. Simpson told them that Plaintiff was being terminated.  (DT Dep. 87-90; LN Dep. 14).  They allege that, after Plaintiff was fired, they saw Plaintiff in the parking lot after she was fired and said "I'm very sorry" and "I'm sorry" (DT Dep. 90; LN Dep. 24-5; RB Dep. 382-3).  Based on this testimony, both Ms. Tucker and Ms. Nanry did not believe that Plaintiff's termination was warranted.

178.     Mr. Simpson did not take adverse employment action against Ms. Nanry and Ms. Tucker, whom he appointed Principals in 2003.  Both were retained in that position from 2003 to present.  Ms. Nanry and Ms. Tucker did not take FMLA and did not disclose any disability.  (FS Dep. 197).  Mr. Simpson hired Judy Coan to fill Plaintiff's position as Lower School Principal. Ms. Coan, like Ms. Nanry and Ms. Tucker, did not take FMLA leave and did not disclose any disability, and has been retained. (FS Dep. 197-8).

R.                              **EEOC CHARGE**

179.     In March 2007, Plaintiff's counsel sent a letter to Vincent D'Andrea, Esq., Lavelle's attorney, regarding Plaintiff's claims.  Mr. D'Andrea forwarded the letter to Defendants.  (Pl. Dep. Exh. 7; VD Dep. 36).

180.     In April 2007, Plaintiff filed a timely charge of discrimination, harassment and retaliation with the United States Equal Employment Opportunity Commission ("EEOC"). (Compl. ¶ 9; Pl. Dep. Exh. 9; VD Dep. 42-3; RB Dep. 206-8; see also Def. Dep. Exh. 15). Defendants received same.  (FS Dep. 202).

**S.**     **DEFENDANTS' STATEMENTS TO EEOC ABOUT PLAINTIFF'S DISABILITY**

181.     Defendants responded to Plaintiff's EEOC Charge and filed papers with EEOC. (FS Dep. 72, 202).  According to Defendant Simpson, Defendants' intention was to submit true and accurate information to EEOC.  (FS Dep. 204-5).

182.     During the EEOC proceedings in 2007 and 2008, Defendants repeatedly asserted to EEOC that Defendant Frank Simpson was unaware that Plaintiff is a recovering alcoholic until June 2006, when Plaintiff told him that she is a recovering alcoholic during the Duffy Arbitration.  (Pl. Dep. Exh. 10; Pl. Dep. Exh. 12).

183.     Plaintiff's EEOC Charge in Paragraph 4 stated: "I am a recovering alcoholic....." (Pl. Dep. Exh. 9).

184.     Plaintiff's EEOC Charge in Paragraph 15 stated: "In the Spring of 2006, I was preparing to testify at an arbitration.  I told Mr. Simpson and the School's attorney, Vincent D'Andrea, Esq., that I am a recovering alcoholic and a member of Alcoholics Anonymous."  (Pl. Dep. Exh. 9).

185.     In May 2007, Defendant Frank Simpson signed and filed with EEOC a response to Plaintiff's EEOC Charge. (Pl. Dep. Exh. 10; VD Dep. 43-5; FS Dep. 203-5).

186.     In response to Paragraph 4 of Plaintiff's EEOC Charge, Mr. Simpson stated: "Deny the allegations contained in paragraph #4.  The employee has consistently indicated that she has no medical history concerning alcohol abuse...."  (Pl. Dep. Exh. 10; FS Dep. 206-7).

187.     In response to Paragraph 15 of Plaintiff's EEOC Charge, Mr. Simpson stated: "Deny the allegations contained in paragraph # 15 except admits so much thereof that the employee indicated that she was a recovering alcoholic."  (Pl. Dep. Exh. 10; FS Dep. 206-7).

188.     In October 2007, Mr. D'Andrea sent a letter to EEOC stating that his law firm was representing Lavelle in the EEOC Matter. (Pl. Dep. Exh. 8; VD Dep. 38-42).

189.     In November 2007, Defendant Frank Simpson signed and filed with EEOC a position statement with a binder of documents. (Pl. Dep. Exh. 12; VD Dep. 48-9).  In that position statement, Mr. Simpson reiterated his response to Paragraph 4 of Plaintiff's EEOC Charge.  (Pl. Dep. Exh. 12 at Bates DEF 00681).  According to Mr. Simpson, he intended to submit accurate information to EEOC.   (FS Dep. 213-5).

190.     In the November 2007 position statement submitted to EEOC, Defendant Simpson reiterated: "During an arbitration hearing at Lavelle School for the Blind on June 23, 2006, Ms. Behringer disclosed to the school's attorney, Vincent D'Andrea, and the Superintendent that she is an alcoholic."  (Pl. Dep. Exh. 12 at Bates DEF 00672).

191.     On January 14, 2008, the EEOC conducted an interview of witness Diane Tucker, a Principal at Lavelle.  Ms. Tucker was represented by counsel at such interview.  According to Ms. Tucker, she gave truthful and complete information to EEOC. (DT Tr. 92-4, 101-2). According to Mr. Simpson, he believes she provided accurate information to EEOC.  (FS Dep. 209-11).

192.     The EEOC prepared an investigatory memorandum documenting the witness interview.  (DT Tr. 94-100; Pl. Dep. Exh. 63).  As set forth in EEOC's investigatory memorandum, Ms. Tucker stated the following regarding Mr. Simpson's knowledge of Plaintiff being a recovering alcoholic:

> "With regard to Frank's knowledge of Ronnie being a recovering alcoholic, Diane
>
> stated that she believed Frank found out in about spring of 2006 in connection

with an arbitration hearing in the grievance of a former worker.  Diane mentioned

that Ronnie was afraid it might come up and told Frank."

(Pl. Dep. Exh. 63 at Bates P0394).

193.    On January 14, 2008, the EEOC conducted an interview of witness Lorrie Nanry,

a Principal at Lavelle.  Ms. Nanry was represented by counsel at such interview.  (LN Dep. 16-7).

According to Ms. Nanry, she gave truthful and complete information to EEOC. (LN Dep. 17).

According to Mr. Simpson, he believes she provided accurate information to EEOC. (FS Dep.

209-11).

194.    The EEOC prepared an investigatory memorandum of the interview.  (Pl. Dep.

Exh. 66).  As set forth in EEOC's investigatory memorandum, Ms. Nanry stated the following

regarding Mr. Simpson's knowledge of Plaintiff being a recovering alcoholic:

> "Lorrie stated that she did not believe Frank was aware that Ronnie was a
>
> recovering alcoholic until sometime in about 2006 when told him as part of an
>
> arbitration hearing involving a former employee who Ronnie had helped.  Lorrie
>
> stated that Ronnie thought her being a recovering alcoholic would come out as
>
> part of her arbitration hearing testimony and she told Frank and the attorney,
>
> Vincent D'Andrea."

(Pl. Dep. Exh. 66 at Bates P0397).

195.    During her deposition, Ms. Nanry alleged that she told EEOC: "I did tell her that

as a result of an arbitration Frank was informed that Ronnie was a recovering alcoholic."  (LN

Dep. 22; see also LN Dep. 39 ("I knew definitely on 2006 at the arbitration that Ronnie had told

him.")

196.    Ms. Nanry admits that she has no personal knowledge that Simpson had prior knowledge of Plaintiff's recovering alcoholic status.  (LN Dep. 38-9).

197.    Defendants never amended their EEOC submissions.  (FS Dep. 216).

198.    In 2007, EEOC interviewed Plaintiff.  (RB Dep. 216-7; Def. Dep. Exh. 17).  At that time, Plaintiff told EEOC that in 2001/2002, Plaintiff thought Mr. Simpson knew she was a recovering alcoholic.  (RB Dep. 289-90, 295, 634-5).

199.    Several months after Plaintiff spoke with EEOC, and in 2008, Plaintiff received and reviewed the EEOC's file, which contained materials that Plaintiff had not previously seen. (RB Dep. 634).  As Plaintiff explained during her deposition, in 2008, after she received and reviewed the EEOC's file, including Defendants' EEOC submissions and EEOC's investigative memoranda, her belief changed because, among other items, Defendants (including Mr. Simpson) repeatedly represented to EEOC that Mr. Simpson did not know Plaintiff was a recovering alcoholic until she told him that in June 2006, and similar statements were made to EEOC by both Ms. Nanry and Ms. Tucker, as documented by EEOC's investigative memoranda. (RB Dep. 635, 640-8).

**T.    DEFENDANTS' STATEMENTS ABOUT PLAINTIFF'S DISCHARGE**

200.    In Defendants' November 2007 EEOC submission, which Mr. Simpson signed and filed with EEOC, Defendants alleged that Plaintiff was fired for "unacceptable work behavior in several areas over 6 six years."  (Pl. Dep. Exh. 12 at Bates Number DEF 00669).  In Defendants' May 2007 EEOC submission, which Mr. Simpson signed and filed with EEOC, Mr. Simpson alleged that Plaintiff "was discharged for a pattern of legitimate, non-discriminatory reasons", which according to Mr. Simpson included (1) chronic lateness to school; (2) chronic

failure to punch in and out; (3) misuse of school telephone; (4) failure to work as an effective

administrative team member; (5) misrepresenting facts regarding the Destiny incident; (6)

unprofessional interaction with personnel; and (7) loss of credibility.  (Pl. Dep. Exh. 10 at Bates

Number DEF 00562).

U.      **MR. SIMPSON'S EXPLANATION FOR DISCHARGE IN DEPOSITION**

201.     During Mr. Simpson's deposition, he was asked to explain his reason for firing

Plaintiff.  Mr. Simpson testified that the sole reason he fired Plaintiff was for allegedly

"inappropriately reporting a staff member gawking at a young girl rolling around on the floor

naked from the waist down getting a suppository and inappropriately and inaccurately reporting

that." (FS Dep. 177).  This is completely untrue.  (RB Aff. ¶ 3, 4).

202.     Mr. Simpson identified the "young girl" as Lower School female student

"Destiny" (FS Dep. 181-2) and identified the date of the alleged incident as February 13, 2007

(FS Dep. 177).

203.     According to Mr. Simpson, Mr. Wier told Mr. Simpson there was an incident on

February 13, 2007.  (FS Dep. 238).  Mr. Simpson admits that no one filed a written complaint.

204.     Mr. Simpson has no personal knowledge of the events of February 13, 2007 as he

was not in the gym on February 13.  (FS Dep. 192).

205.     According to Defendant Simpson, he conducted an investigation and prepared

handwritten notes of witness interviews (Pl. Dep. Exh. 57; FS Dep. 179-80).  According to Mr.

Simpson, his notes refer to Gary Wier ("GW"), Destiny ("DM"), Plaintiff ("RB") and Susan

Kiley ("SK") (FS Dep. 186-7).

206.     According to Mr. Simpson, he interviewed, among others, Karen Gerweck (gym teacher) and Natasha Mousami (teacher), who were in the gym in February 13, 2007.  (Pl. Dep. Exh. 57 at Bates Number DEF 001393).

207.     According to Mr. Simpson, either Karen Gerweck or Natasha Mousami, who were both in the gym, told him that Destiny had pulled her pants down.  (FS Dep. 180-83; Pl. Dep. Exh. 57 at Bates DEF 1393; see also Simpson Aff. ¶ 90).  This corroborates that Destiny was, in fact at some point "naked from the waist down."  (See, e.g., Gerweck Aff. II).

## V.          **MR. SIMPSON'S EXPLANATION IS PRETEXTUAL**

208.     Mr. Simpson's explanation in deposition for firing Plaintiff is a pretext for discrimination and retaliation.

209.     Plaintiff was at work on February 13, 2007.  (RB Dep. 385, 390).  On that date, there was an incident involving a Lower School female student named Destiny.  (RB Dep. 390-391).

210.     On February 13, 2007, Destiny was in the gym and was having a tantrum in the gym.  During this tantrum, Destiny pulled down her pants and underwear (pull-up diaper) and her buttocks were visible.  (RB Dep. 391, 405, 407; Gerweck Aff. II ¶ 5-6).

211.     Staff members pulled up Destiny's pants.  When they did so, Destiny pulled her pants and underwear back down.   (Gerweck Aff. II ¶ 7). Plaintiff saw Destiny on the floor.  (RB Dep. 424).

212.     Ms. Behringer intervened in the situation in the gym on February 13, 2007 involving Destiny and her tantrum.  It was proper and routine for Ms. Behringer to do so as Lower School Principal.  (Gerweck Aff. II ¶ 8-9; RB Dep. 392, 420).

213.    At the time that Destiny was having a tantrum in the gym, there were other staff members in the gym, including Francis (Paco) Secada.  Mr. Secada was with a male student named Orlando.  (Gerweck Aff. II ¶ 10; RB Dep. 391, 393-4; Wier Aff. ¶ 9).

214.    Also present in the gym were (1) Susan Kiley, nurse (RB Dep. 391-2); (2) Karen Gerweck, gym teacher (RB Dep. 391-2); and (3) Natasha Mousami, teacher, Lower School, who reported to Plaintiff (RB Dep. 391-4).   They were in the vicinity.  (RB Dep. 405-6).

215.    Paco and Orlando were in close proximity to Destiny and they were both facing Destiny while she was having a tantrum and was pulling down her pants and underwear.  (Gerweck Aff. II ¶ 11; RB Dep. 391, 396-7, 399, 406; Def. Dep. Exh. 22).  The two of them were looking at Destiny's buttocks. (RB Dep. 404-5, 407).

216.    Ms. Behringer politely and repeatedly asked Paco to take his student (Orlando) out of the vicinity.  It was completely proper for Ms. Behringer to do so.  (Gerweck Aff. II ¶ 12; RB Dep. 391, 394-5, 403-4, 413, 418).  Plaintiff did not yell, scream or raise her voice to Mr. Secada.  (RB Dep. 411-12).

217.    At that point, the matter was resolved.  (RB Dep. 410).  As Plaintiff testified, "Destiny pulled out of it and she was fine."  (RB Dep. 422, 391-2).

218.    Ms. Behringer did not engage in any improper behavior.  At all times, her conduct was appropriate for the situation.  (Gerweck Aff. II ¶ 13; RB Dep. 430, 435-6).

219.    On or about February 26, 2007, at Mr. Simpson's request, Plaintiff discussed the events of February 13 with Mr. Simpson.  She advised Mr. Simpson of the events as outlined above, including that Destiny's buttocks were visible, that she asked Mr. Secada to move out of

the vicinity, and that she advised Mr. Wier of the matter. (RB Dep. 437-40, 442-3; <u>see also</u> FS

Dep. 183-6, 230; Pl. Dep. Exh. 57 at DEF 1395-6).

220.    Ms. Behringer spoke with Gary Wier (Transition Coordinator), who was Mr.

Secada's supervisor.  (RB Dep. 392, 401-2).  Ms. Behringer advised Gary Wier that Destiny's

pants were down, her buttocks were visible, Mr. Secada and a student were too close to Destiny,

and it had been necessary for her to ask Mr. Secada to move out of the vicinity of Destiny.  (RB

Dep. 392, 401-2, 409-10). Plaintiff also told Mr. Wier words to the effect of that when she first

saw Destiny and the nurse in the gym, it initially looked like she might be receiving a

suppository, but that Plaintiff quickly realized that Destiny was only having a tantrum and was

not actually receiving a suppository (RB Dep. 402, 408, 411, 417-8).

221.    Mr. Wier indicated that he would discuss the matter with Mr. Secada.  (RB Dep.

392, 401-2, 410).  Plaintiff advised Mr. Wier of the matter because she had just corrected the

actions of his subordinate, Mr. Secada. (RB Dep. 412-3).  Plaintiff did not tell Mr. Wier that

"Mr. Secada was gawking at this little girl while she was naked and getting a suppository."  (RB

Dep. 410, 424).  Plaintiff never stated that Destiny was actually receiving a suppository.  (RB

Dep. 443).

222.    On February 14, 2007, Mr. Wier sent an email to Plaintiff, stating:

I wanted you to know that I had a follow-up discussion with Francis Secada

concerning yesterday morning's confusion in the gym.  He claims he did not know

what was going on with your student and he apologized for not recognizing that

he should leave with his assigned students.  I suggested that he be protective of

your students and his at all times and especially when using the gym......I would

be glad to meet with you on this further should you like to do so.  Thank you, Gary.

(Pl. Dep. Exh. 58).

223.    Mr. Wier provided this email to Frank Simpson.  Mr. Simpson admits receiving this email from Mr. Wier and alleges that he submitted the document to EEOC.  (Pl. Dep. Exh. 58; FS Dep. 188-9).

224.    As this email indicates, Mr. Wier counseled Mr. Secada ("Paco") for his inappropriate actions in the gym and Mr. Secada apologized.  There is nothing in this email that questions or criticizes in any way Ms. Behringer's actions on February 13, 2007.  (Pl. Dep. Exh. 58).

225.    Plaintiff responded to Mr. Wier by email.  (RB Dep. 426-7; Pl. Dep. Exh. 58; Def. Dep. Exh. 23).  Plaintiff and Mr. Wier spoke and confirmed his email to her.  (RB Dep. 426, 434-5).

226.    As of February 13, 2007, Gary Wier was a Transition Coordinator and had been employed less than two years.  (FS Dep. 238; DT Dep. 19-20, 75-6).  In fact, at the August 4, 2006 staff meeting, Mr. Simpson was critical of Mr. Wier's knowledge and performance and told Ms. Tucker she needed to work with Gary Wier because he didn't have the knowledge of students' needs.  (DT Dep. 48-9; Pl. Dep. Exh. 57).  Francis (Paco) Secada, hired in 2005, was also a short term employee and he reported to Mr. Wier.  (DT Dep. 75-6, 84-5; RB Dep. 392; Wier Aff. ¶ 5).

227.    Defendants did not take any adverse action against Mr. Secada relating to February 13, 2007.  (FS Dep. 191).

228.    It is proper to intervene when a student has a tantrum or exhibits certain other behaviors, to protect the student.  At Lavelle, behavioral intervention in the Lower School is routine.  (Gerweck Aff. II ¶ 8-9; RB Dep. 392, 413).  It was routine for Plaintiff to intervene in such matters, she had done so on prior occasions, it took Plaintiff no more than 10 minutes to resolve the matter in February 13, 2007 and, therefore, it was essentially a "non incident" at Lavelle. (RB Dep. 420-2, 392, 441;  FS Dep. 238-9; Gerweck Aff. II ¶ 8-9).

229.    Plaintiff did not file a formal report or formal complaint about the events of February 13, 2007 and did not seek disciplinary action against Mr. Secada or any staff member. (RB Dep. 420, 423-4; FS Dep. 238).

230.    Gary Wier reported to Ms. Tucker.  (FS Dep. 238; DT Dep. 19-20, 75-6). Plaintiff may have mentioned the events of February 13, 2007 to Diane Tucker. (RB Dep. 420, 423-4). Ms. Tucker was not in the gym on February 13, 2007. (DT Dep. 68).  Ms. Tucker received a copy of Mr. Wier's email to Plaintiff.  (Pl. Dep. Exh. 58; DT Dep. 65-7).  Ms. Tucker understood that Destiny was a Lower School female student in Plaintiff's program.  (DT Dep. 65, 70-5).  According to Ms. Tucker, Susan Kiley, nurse, told her that Destiny had a tantrum and was pulling at her clothes and the top of her buttocks were exposed.  (DT Dep. 81-2).  This was consistent with Plaintiff's description of the matter.

231.    During Plaintiff's employment, a student named Danny did receive a rectal suppository from the nurse in the gym.  (RB Dep. 413-416).  Ms. Nanry was not at Lavelle on February 13, 2007.  (LN Dep. 14).

## W. DEFENDANTS' CHANGE OF STORY REGARDING PLAINTIFF'S DISABILITY

232.    For this lawsuit, Defendants changed their story as to Mr. Simpson's alleged knowledge of Plaintiff's status as a recovering alcoholic.

233.    As noted above, during the EEOC proceedings in 2007 and 2008, Defendants repeatedly represented to EEOC that Mr. Simpson did not know Plaintiff was a recovering alcoholic until she told him so in June 2006.  (See Point II-S above).

234.    In 2008, when Defendants filed their Answer to the lawsuit Complaint, Defendants changed their story, alleging for the very first time as follows: "aver that Simpson was aware that plaintiff was a recovering alcoholic prior to the spring of 2006."  (Ans. ¶ 40; Pl. Dep. Exh. 17).  Mr. Simpson testified that Defendants' Answer is true and accurate.  (FS Dep. 8-10).

235.    In 2010, when Plaintiff deposed Mr. Simpson, he again alleged he knew Plaintiff was a recovering alcoholic before she told him.  Thus, Mr. Simpson directly contradicted his prior repeated written and signed submissions to EEOC.  (FS Dep. 157-9).

236.    When Plaintiff deposed Mr. Simpson, Mr. Simpson was completely unable to identify how or when he allegedly learned that information prior to Plaintiff's disclosure to him in 2006.  (FS Dep. 157-9).  Notwithstanding Mr. Simpson's deposition testimony, several months later, when he executed an "affidavit" for Defendants' motion for summary judgment, he now alleges for the first time that his knowledge was based on Plaintiff's "comments" and on "rumors." (Simpson Aff. ¶ 24).  This "affidavit" contradicts Mr. Simpson's prior deposition testimony that he was unable to explain his alleged "knowledge" and contradicts Mr. Simpson's repeated written and signed submissions to EEOC in 2007.

237.    During Mr. Simpson's 2010 deposition, he sought to disavow his prior written and signed EEOC submissions. He alleged for the very first time that Defendants' EEOC submissions, which Mr. Simpson prepared and signed, were incorrect to the extent they stated that he did not know Plaintiff was a recovering alcoholic until June 2006.  (FS Dep. 206-7, 215-16).

238.    Defendants never amended their EEOC submissions and Mr. Simpson admits he never asserted to EEOC that he knew Plaintiff was recovering alcoholic prior to June 2006.  (FS Dep. 221).

## X. DEFENDANTS' CHANGE OF STORY REGARDING PLAINTIFF'S DISCHARGE

239.    Defendants changed their story with respect to Defendants' alleged reason for firing Plaintiff.

240.    As noted above, during the EEOC proceedings in 2007, Mr. Simpson repeatedly alleged in his written and signed EEOC submissions that he fired Plaintiff because of six years of ongoing unacceptable job performance.  (See Point II-T above).

241.    After this lawsuit was filed, Defendants changed their story.  As noted above, during Mr. Simpson's deposition, he was asked to explain his reason for firing Plaintiff.  Mr. Simpson testified that the sole reason he fired Plaintiff was for allegedly "inappropriately reporting a staff member gawking at a young girl rolling around on the floor naked from the waist down getting a suppository and inappropriately and inaccurately reporting that."  (FS Dep. 177).  This testimony contradicted Mr. Simpson's signed EEOC submissions in 2007.

**Y. PLAINTIFF RECEIVED MORE DOCUMENTS PRAISING HER PERFORMANCE**

242.    After Ms. Behringer separated from Lavelle, Sister Angelus Healy, who had retired as Superintendent of Lavelle in or about 2001, gave Ms. Behringer a letter of recommendation recognizing her outstanding job performance at Lavelle.  During Plaintiff's employment, Ms. Healy had written various documents recognizing Plaintiff's outstanding performance.  She provided Plaintiff with a strong personal letter of recommendation after Plaintiff was fired.  (Compl. ¶ 53; Pl. Dep. Exh. 2).

**Z.      CONCLUSION**

243.    The Court should deny Defendants' motion.

Dated:         May 25, 2010
               New York, New York

                                      GOLDBERG & FLIEGEL LLP
                                      /s/ Kenneth A. Goldberg

                          By:    _____
                                      Kenneth A. Goldberg(KG0295)
                                      Goldberg & Fliegel LLP
                                      60 East 42nd Street, Suite 3421
                                      New York, NY 10165
                                      (212) 983-1077
                                      Attorneys for Plaintiff