UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————————————

ELENOR BEHRINGER,

                  **Plaintiff,**            08 Civ. 4899 (JGK)

      - against -            MEMORANDUM OPINION AND
                                      ORDER

LAVELLE SCHOOL FOR THE BLIND, ET
AL.,

                **Defendants.**
————————————————————————————————

JOHN G. KOELTL, District Judge:

     The plaintiff, Elenor Behringer (the "plaintiff"), a former

Lavelle school principal, brings this action against her former

employer, Lavelle School for the Blind ("Lavelle" or the

"School"), and Frank Simpson ("Simpson"), the superintendent of

Lavelle (collectively, the "defendants").  The plaintiff alleges

that she is a recovering alcoholic and that the defendants

discriminated against her because of her disability in violation

of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. §

12101 et seq., the New York State Human Rights Law ("NYSHRL"),

N.Y. Exec. Law § 290 et seq., and the New York City Human Rights

Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 et seq.  In addition,

the plaintiff asserts claims of hostile work environment under

these federal, state, and city statutes.[1]  The plaintiff also

---

[1] At oral argument of the pending motion for summary judgment,
the plaintiff withdrew her claims under these statues that she
was retaliated against because of her disability or the exercise
of rights in connection with her disability.

asserts a claim of unlawful retaliation under the Family Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 et seq.   The defendants move for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), or, in the alternative, for summary judgment pursuant to Federal Rule of Civil Procedure 56, on each of the plaintiff's claims.   The plaintiff opposes the motion.

I

Because the defendants specifically moved "in the alternative for summary judgment" pursuant to Federal Rule of Civil Procedure 56, and the parties have submitted evidentiary materials that go beyond the pleadings, the Court will treat the motion as a motion for summary judgment.

The standard for granting summary judgment is well established.   "The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., LP, 22 F.3d 1219, 1223 (2d Cir. 1994).   "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.   Its

duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224. The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The substantive law governing the case will identify those facts which are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Robins v. N.Y.C. Bd. of Educ., No. 07 Civ. 3599, 2010 WL 2507047, at *1 (S.D.N.Y. June 21, 2010).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); see also Gallo, 22 F.3d at 1223. Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the non-moving party. See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994). If the moving party meets its burden, the non-moving party must produce evidence in the record and

3

"may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible . . . ." Ying Jing Gan v. City of N.Y., 996 F.2d 522, 532 (2d Cir. 1993); see also Scotto v. Almenas, 143 F.3d 105, 114-15 (2d Cir. 1998) (collecting cases); Robins, 2010 WL 2507047, at *1.

II

The following facts are undisputed unless otherwise noted.

A

The plaintiff joined Lavelle as a teacher in 1990 and remained at the school for 17 years in various roles, including school principal. (Compl. ¶ 14; Defs.' 56.1 Stmt. ¶ 1; Pl.'s 56.1 Stmt. ¶ 1.)  In 1984, six years prior to her date of hire, the plaintiff claims she was diagnosed an alcoholic. (Behringer Dep. 103; Defs.' 56.1 Stmt. ¶ 1; Pl.'s 56.1 Stmt. ¶ 1.)  The plaintiff obtained treatment from Alcoholics Anonymous for her condition, and remained sober thereafter and during her first three years as a Lavelle teacher. (Defs.' 56.1 Stmt. ¶ 1; Pl.'s 56.1 Stmt. ¶ 1.)  In 1993, while teaching at Lavelle, the plaintiff experienced a relapse. (Compl. ¶ 18; Defs.' 56.1 Stmt. ¶ 2; Pl.'s 56.1 Stmt. ¶ 2.)  From January 1993 to September 1993, the plaintiff took disability leave and was hospitalized at different facilities for her alcoholism and related conditions. (Compl. ¶ 18; Defs.' 56.1 Stmt. ¶ 4; Pl.'s 56.1 Stmt. ¶ 4.)  The defendants note that the plaintiff's

4

benefits claim forms from this period do not reflect medical treatment for alcoholism; the plaintiff alleges, however, that certain medical documents from this timeframe do reference her addiction to alcohol, and the plaintiff submitted a disability benefits form to Lavelle in which she cited her alcoholism. (Behringer Dep. 131, 141; Goldberg Cert. Exs. I, J, N; Defs.' 56.1 Stmt. ¶ 4; Pl.'s 56.1 Stmt. ¶ 4.)

The plaintiff returned to work at Lavelle in September 1993 and was eventually appointed school principal.  (Defs.' 56.1 Stmt. ¶¶ 9, 11; Pl.'s 56.1 Stmt. ¶¶ 9, 11.)  Since September 1993, the plaintiff has been sober, although she continues to attend Alcoholics Anonymous meetings. (Defs.' 56.1 Stmt. ¶ 3; Pl.'s Opp'n Br. 4.)  The plaintiff told some of her Lavelle colleagues that she was a recovering alcoholic; staff health forms that the plaintiff submitted to the School between 2002 and 2007, however, never indicated her status as such. (Behringer Dep. 111-13; Behringer Dep. Pl.'s Ex. 11; Goldberg Cert. Ex. O, P; Defs.' 56.1 Stmt. ¶¶ 3, 5; Pl.'s 56.1 Stmt. ¶¶ 3, 5.)

In June 2001, Frank Simpson ("Simpson") was hired as Superintendent of Lavelle and became the plaintiff's supervisor. (Defs.' 56.1 Stmt. ¶ 11; Pl.'s 56.1 Stmt. ¶ 11.)  Simpson reappointed Behringer as school principal in 2002 for the 2002-2003 school year.  (Defs.' 56.1 Stmt. ¶ 21; Pl's 56.1 Stmt.

¶ 21.)  In August 2002, Behringer received a salary increase and an award for her work.  (Defs.' 56.1 Stmt. ¶ 22; Pl.'s 56.1 Stmt. ¶ 22.)  On October 7, 2003, Simpson issued the plaintiff a review of her job performance, which stated that she "met expectations." (Defs.' 56.1 Stmt. ¶ 23; Pl.'s 56.1 Stmt. ¶ 23.)

On October 23, 2003, Simpson divided Lavelle into three sections, and he appointed the plaintiff to the post of Lower School principal.  (Defs.' 56.1 Stmt. ¶ 25; Pl.'s 56.1 Stmt. ¶ 25.)  Diane Tucker ("Tucker") became principal of the Upper School, and Lorrie Nanry ("Nanry") was appointed principal of the Pre-school.  (Defs.' 56.1 Stmt. ¶ 26; Pl.'s 56.1 Stmt. ¶ 26.)  On January 6, 2005, Simpson issued the plaintiff a performance review stating that she had again "met expectations" for the period from September 2003 to December 2004.  (Compl. ¶ 32; Defs.' 56.1 Stmt. ¶ 28; Pl.'s 56.1 Stmt. ¶ 28.)

The plaintiff's father fell ill during April 2005.  (Defs.' 56.1 Stmt. ¶ 30; Pl.'s 56.1 Stmt. ¶ 30.)  In May 2005, the plaintiff submitted the necessary forms to procure FMLA leave to care for him on an intermittent basis.  (Pl.'s 56.1 Stmt. ¶ 31; Defs.' 56.1 Stmt. ¶ 31.)  Thereafter, the plaintiff took FMLA leave on May 2-May 13, May 31-June 7, and October 11-October 17, 2005, and traveled to Virginia, where her father was receiving treatment.  (Defs.' 56.1 Stmt. ¶¶ 30-31; Pl.'s 56.1 Stmt. ¶¶ 31-32.)  The plaintiff took FMLA leave again November 2-18, 2005,

to visit her father where he resided on Grand Bahama Island.
(Defs.' 56.1 Stmt. ¶ 34; Pl.'s 56.1 Stmt. ¶ 34; Simpson Aff. Ex.
H.)  While on Grand Bahama Island, the plaintiff participated in
a triathlon on Saturday, November 5, 2005.  (Pl.'s 56.1 Stmt. ¶
35.)

Simpson claims that, during the plaintiff's absence,
Lavelle employees including Nanry and Tucker complained that
Behringer was misusing her FMLA leave to participate in the
triathlon, and they requested that he investigate.  (Defs.' 56.1
Stmt. ¶ 36; Defs.' Mot. 8.)  After an Internet search, Simpson
discovered that Behringer had in fact participated in the
triathlon.  (Defs.' 56.1 Stmt. ¶ 37; Pl.'s 56.1 Stmt. ¶ 38.)
Upon the plaintiff's return, Simpson inquired into the
plaintiff's activities during her FMLA leave and informed her of
administrative concerns and requirements regarding her leave.
He then issued the plaintiff a memorandum dated November 23,
2005, that asked that she be "more precise in accounting for the
days used for specific care of [her] father and any time spent
for other purposes during [the] period from November 2-18,
2005."  (Behringer Dep. Ex. 6; Simpson Aff. Ex. H; Defs.' 56.1
Stmt. ¶ 38; Pl.'s 56.1 Stmt. ¶ 38.)  Behringer responded with a
written memorandum dated December 15, 2005, in which she
complained about Simpson's inquiry on the grounds that Saturday
was a "non-FMLA day," and because the defendants had included

four holidays in her FMLA leave day count.  (Compl. ¶ 33;
Behringer Dep. Ex. 6; Pl.'s 56.1 Stmt. ¶ 39.)  Simpson sent this
memorandum to the School's attorney, Vincent D'Andrea
("D'Andrea").  (Simpson Dep. 104-05.)  The plaintiff also
complained orally to D'Andrea on December 21, 2005.  (Pl.'s
Opp'n Br. 22.)  Simpson testified that D'Andrea notified him of
Behringer's complaint, namely that she had said, "they're
[xxx]ing with my FMLA days . . . I have a labor lawyer."
(D'Andrea Dep. 25.)  In early January 2006, Simpson told the
plaintiff he thought her manner of complaining to D'Andrea with
such language in the School hallway was inappropriate.  (Simpson
Dep. 111.)

On January 11, 2006, Simpson issued the plaintiff an annual
performance evaluation for the period from January 2005 to
January 2006, in which he gave the plaintiff an overall rating
of "below expectations."  (Defs.' 56.1 Stmt. ¶¶ 42-44; Pl.'s
56.1 Stmt. ¶¶ 40, 42, 44; Defs.' Mot. 8.)  The plaintiff alleges
that the performance review contained false criticisms of her
job performance.  (Pl.'s 56.1 Stmt. ¶ 44.)  Simpson maintains,
however, that the review was based on accurate data he had
collected for months, and that the plaintiff's performance had
been "terrible," both on an absolute and relative basis.
(Simpson Aff. ¶ 61; Defs.' Mot. 8; Defs.' 56.1 Stmt. ¶ 43.)

The defendants offer several reasons for this poor performance evaluation, including, among other things: the plaintiff's alleged excessive use of Lavelle telephone lines for personal long-distance and international telephone calls; her alleged failure to consult other school principals regarding scheduling matters; her alleged refusal to use didactic "tangible cues" in the classroom; and her alleged frequent tardiness. (Defs.' Mot. 8-9; Defs.' 56.1 Stmt. ¶¶ 45, 47-48.)

The plaintiff denies these allegations. (Pl.'s 56.1 Stmt. ¶¶ 45, 47-48.) For example, the plaintiff avers that she made long-distance telephone calls with the defendants' permission and reimbursed the defendants for these calls, and that she did use "tangible cues" in the classroom. (Behringer Aff. ¶¶ 5-6.)

Simpson and the plaintiff discussed her negative review, and, on January 19, 2006, the plaintiff requested a reevaluation of her performance, to which Simpson agreed. (Defs.' 56.1 Stmt. ¶ 50.) On April 12, 2006, Simpson issued the plaintiff a new, more favorable evaluation, and he reappointed her as principal to the Lower School for the 2006 – 2007 school year. (Defs.' Mot. 10; Defs.' 56.1 Stmt. ¶ 51; Pl.'s 56.1 Stmt. ¶ 51.)

According to the plaintiff, she initially thought that the new review would supersede the old; however, the older, negative review was apparently never destroyed and was retained by Simpson. (Pl.'s 56.1 Stmt. ¶ 50.) Simpson does not recall

telling the plaintiff that the January 2006 evaluation would be replaced. (Simpson Dep. 121-22.)  While the April 2006 evaluation was dated "January 2005 – April 2006," Simpson testified during his deposition that the date should have read "January 2006 – April 2006," for a four-month period only. (Simpson Dep. 150; Behringer Dep. Pl.'s Ex. 53.)  In their reply brief, however, the defendants claim that the negative review of January 2006 was rescinded.  On February 28, 2006, the plaintiff's father died, and the plaintiff took bereavement leave.  (Pl.'s Opp'n Br. 6.)

B

During a labor arbitration hearing in an unrelated case on June 23, 2006, the plaintiff testified on behalf of Lavelle. (Defs.' 56.1 Stmt. ¶ 52; Defs.' Mot 10.)  There, the plaintiff told Simpson and D'Andrea that she was a recovering alcoholic and that she attended Alcoholics Anonymous meetings.  (Defs.' 56.1 Stmt. ¶ 52; Defs.' Mot 10.)  The defendants contend that news of Behringer's alcoholism was not surprising to Simpson, and that Simpson had reason to believe as early as 2001 that Behringer was a recovering alcoholic.  (Ans. ¶ 40; Defs.' 56.1 Stmt. ¶¶ 19, 52; Defs.' Mot. 6.)  During his deposition, Simpson also testified that he had heard rumors about the plaintiff's alcoholism, but could not provide any precise date on which he became aware of it.  (Simpson Dep. 157-58.)  The plaintiff

10

vehemently disagrees with this account.  She notes that, in
Equal Employment Opportunity Commission ("EEOC") proceedings in
2007 and 2008, the defendants represented that Simpson learned
the plaintiff was a recovering alcoholic in June 2006. (Pl.'s
56.1 Stmt. ¶ 19.)   Testimony given by Nanry and Tucker before
the EEOC corroborates this claim. (Behringer Dep. Pl.'s Exs.
63, 66.)  The plaintiff contends that she originally believed
Simpson might have known about her alcoholism prior to June
2006, but that her belief changed once she was presented with
materials from the EEOC proceedings.  (Behringer Dep. 634-648.)

     The defendants thus maintain that Simpson's behavior toward
the plaintiff did not change on account of the June 2006
disclosure, while the plaintiff asserts that Simpson's behavior
toward her did change because of this information.   For
example, the plaintiff alleges that, after June 2006, Simpson
(1) screamed at and verbally abused her and made her cry during
a summer meeting; (2) expressed surprise on the first day of
school in fall 2006, when the plaintiff arrived to work at
Lavelle; (3) asked during a December 2006 holiday party if the
plaintiff wanted a presumably alcoholic drink—a gesture that the
plaintiff viewed as malicious; and (4) issued the plaintiff a
written warning in January 2007 for her failure to "swipe out"
of work in an appropriate manner. (Pl.'s 56.1 Stmt. ¶¶ 54, 55,
56, 57, 58.)  The plaintiff also asserts that Simpson spoke to

her in a generally threatening tone, and was cold to her. (Pl.'s Opp'n Br. 8.)  In turn, the defendants argue that (1) the plaintiff was never singled out during the meetings and that Simpson had also become angry with the School's other principals, Nanry and Tucker; (2) the remark at the outset of the school year—"I'm surprised you came back"—was meant to be sarcastic; (3) Simpson was simply acting as a host at the holiday party, and intended to be gracious, not malicious; and (4) Simpson had a legitimate basis for issuing the written warning.  (Defs.' 56.1 Stmt. ¶¶ 54, 56, 57, 58.)

In January 2007, after Simpson issued the written warning, the plaintiff requested access to her personnel file and was told that the file had been lost.  (Compl. ¶ 45; Pl.'s Opp'n Br. 8.)  The plaintiff asserts that information within this lost file supports evidence of her claims.  (Compl. ¶ 46.)  Simpson subsequently issued the plaintiff a memorandum dated January 5, 2007, stating that the School would investigate her missing file.  (Behringer Dep. Pl.'s Ex. 55.)  In this memorandum, Simpson noted that the plaintiff's "medical information, security information, original application, and references" were not missing and were maintained in other files.  (Behringer Dep. Pl.'s Ex. 55.)  The plaintiff alleges that she never received any subsequent documents regarding the investigation. (Compl. ¶ 47.)

C

On February 13, 2007, an unfortunate incident involving a female student of the Lower School took place in Lavelle's gymnasium.  The student had a tantrum during which she pulled down her pants and underwear.  (Defs.' 56.1 Stmt. ¶ 59; Pl.'s 56.1 Stmt. ¶¶ 59-60.)  Certain Lavelle personnel were present in the gym: Susan Kiley, a school nurse; Natasha Mousami, the student's teacher; Karen Gerweck ("Gerweck"), a gym teacher; and Paco Secada ("Secada"), a job coach; as were one or two students under Secada's supervision.  (Defs.' 56.1 Stmt. ¶ 59; Pl.'s 56.1 Stmt. ¶ 59.)  The plaintiff intervened, and maintains that she did so to keep general order and also because Secada and one of his male students were looking at the girl's buttocks.  (Defs.' 56.1 Stmt. ¶ 60; Pl.'s 56.1 Stmt. ¶ 60.)  The plaintiff alleges that she repeatedly and politely asked Secada to leave the gymnasium and take his student out of the vicinity.  (Pl.'s 56.1 Stmt. ¶ 60.)  After about five to ten minutes, the incident ended.  (Behringer Dep. 421.)

The plaintiff alleges that she then spoke with Secada's supervisor, Gary Wier ("Wier"), and let him know that Secada and his student were too close to the young girl in the gymnasium and that it was necessary for her to ask Secada to leave.

13

(Pl.'s 56.1 Stmt. ¶¶ 61-62.)  Wier also gave some indication in
an e-mail message to her that Secada acted inappropriately
during the incident.  (Behringer Dep. Pl.'s Ex. 58; Pl.'s 56.1
Stmt. ¶ 63.)  Wier also noted in this e-mail message that he had
a conversation with Secada, who apologized for his actions.
 (Behringer Dep. Ex. 58; Pl.'s 56.1 Stmt. ¶¶ 63, 65.)  This e-
mail message was later given to Simpson. (Behringer Dep. Pl.'s
Ex. 58.)

     The defendants offer a different version of this incident.
The defendants assert that Wier did not believe that Secada had
acted inappropriately during the incident, and that Wier felt as
though the plaintiff's intervening actions created a certain
level of stress for Secada and the students.  (Wier Aff. ¶¶ 10-
15; Defs.' 56.1 Stmt. ¶ 63.)  Secada complained to Wier about
the plaintiff's treatment of him, namely her alleged accusations
that he and his student were "gawking" at the young female.
(Defs.' 56.1 Stmt. ¶ 64.)  Wier then notified Tucker about the
plaintiff's behavior during the incident, stating that the
plaintiff had "screamed" and claimed that the student throwing
the tantrum appeared to be receiving a rectal suppository, which
the plaintiff should have known to be untrue.  (Defs.' 56.1
Stmt. ¶ 66.)  Tucker allegedly became so concerned about
Behringer's behavior that she notified Simpson, who, in turn,

conducted an investigation into the incident.  (Defs.' 56.1
Stmt. ¶¶ 67, 69, 73.)

On February 26, 2007, Simpson interviewed the employees who
had been present in the gymnasium on February 13, 2007.  (Defs.'
56.1 Stmt. ¶ 73.)  The defendants contend that none of the
witnesses' stories about the incident corroborates the
plaintiff's account of what transpired.  (Defs.' 56.1 Stmt.
¶¶ 74-76.)  According to the defendants, several employees
reported that the plaintiff was being "nasty, sarcastic, and
uncivil" to Secada.  (Defs.' 56.1 Stmt. ¶ 78.)  At least one
employee who was present, however, has said that it was "proper
[for Behringer] to intervene," and that Behringer "politely and
repeatedly" asked Secada to leave.  (Gerweck Aff. ¶¶ 9, 12.)[2]
The plaintiff also maintains that, to the extent that it is
alleged by the defendants, she never filed any "false report"
with respect to Secada's behavior.  (Pl.'s 56.1 Stmt. ¶ 84.)
All that the plaintiff did was report the incident to Wier,
Secada's supervisor.  Once the incident was over, the plaintiff
claims she considered it a "non-event."  (Pl.'s 56.1 Stmt. ¶
79.)

---

[2] Although Simpson interviewed Gerweck as part of his February
2007 investigation, the defendants note that Gerweck's affidavit
does not state specifically that she communicated the
information in her affidavit to Simpson.  They also argue that
her statement did not corroborate the entirety of the
plaintiff's account.  (See Pl.'s Ex. H, Berhringer Dep. Ex. 12;
Defs.' Mot. 7 n.4.)

On February 28, 2007, Simpson discharged Behringer.
(Defs.' Mot. 13.)  A termination memorandum stated that the
plaintiff was being terminated for "behavior in the work
environment that is unacceptable for an administrator and a
Lavelle School employee." (Defs.' 56.1 ¶¶ 80-81.)  The
plaintiff claims that her termination was "sudden," and that
Simpson's allegations as to her behavior were false.  (Pl.'s
Opp'n Br. 8.)

In April 2007, the plaintiff filed a charge of
discrimination, harassment, and retaliation with the EEOC.  In
March 2008, the EEOC issued the plaintiff a right to sue letter.
(Compl. ¶ 10.)  On May 28, 2008, the plaintiff filed this
action.

                              III

The plaintiff brings discrimination claims[3] under the ADA,
the NYSHRL, and the NYCHRL.[4]   The ADA makes it unlawful for an

---

[3] The plaintiff brings claims under the NYSHRL and the NYCHRL
against Lavelle and Frank Simpson, alleging that Simpson is
individually and personally liable for his conduct both as an
employer and as an aider and abettor.  (See Compl. ¶¶ 100, 106,
108, 114, 121, 123); see also N.Y. Exec. Law §§ 296(1), 296(c);
N.Y.C. Admin. Code §§ 8-107(1), 8-107(6).  The plaintiff brings
claims under the ADA against Lavelle only.  There is no right of
recovery against individual defendants under the ADA.  Corr v.
MTA Long Island Bus, No. 98-9417, 1999 WL 980960, at *2 (2d Cir.
Oct. 7, 1999).
[4] Claims under the NYSHRL are construed pursuant to the same
standards as those under the ADA, although the definition of
disability is broader under the state statute.  See Ferraro v.
Kellwood Co., No. 03 Civ. 8492, 2004 WL 2646619, at *5 n.10

                              16

employer to discriminate "against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a).[5]  The NYSHRL and NYCHRL likewise prohibit discrimination against an individual because of her disability.  See N.Y. Exec. Law § 296(1)(a); N.Y.C. Admin. Code §8-107(1)(a).  Employment discrimination claims brought pursuant to the ADA, the NYSHRL, and the NYCHRL are governed at summary judgment by the burden-shifting standard established for Title VII claims in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See, e.g., Dawson v. Bumble &

-------

(S.D.N.Y. Nov. 18, 2004).  However, pursuant to the Local Civil Rights Restoration Act of 2005 ("Restoration Act"), N.Y.C. Local Law No. 85 (2005), the Court must evaluate claims brought under the NYCHRL separately from counterpart claims brought under the state or federal civil rights laws.  See Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 278 (2d Cir. 2009) (explaining that the Restoration Act "abolish[ed] 'parallelism' between the [NYCHRL] and federal and state antidiscrimination law"); Restoration Act § 7 ("The provisions of this [ ] title shall be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title[,] have been so construed."); id. § 1 ("Interpretations of New York state or federal statutes with similar wording may be used to aid in interpretation of [the NYCHRL], viewing similarly worded provisions of federal and state civil rights laws as a floor below which the [NYCHRL] cannot fall . . . .").

[5] The plaintiff's claims arose prior to the effective date of the ADA Amendments Act of 2008, which supplanted "with a disability because of the disability of such individual" with "on the basis of disability."  See Pub. L. 110-325 § 5(a)(1) (the Act "shall become effective on January 1, 2009").  The Second Circuit Court of Appeals has not applied the amendments retroactively. See, e.g., Ragusa v. Malverne Union Free Sch. Dist., 381 F. App'x 85, 87 n.2 (2d Cir. 2010) (summary order); Gibbon v. City of New York, No. 07 Civ. 6698, 2008 WL 5068966, at *5 n.47 (S.D.N.Y. Nov. 25, 2008).

Bumble, 398 F.3d 211, 217 (2d Cir. 2005) (NYSHRL and NYCHRL);

Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 52 (2d Cir. 1998)

(ADA).

To establish a prima facie case of employment

discrimination under these statutes,[6] the plaintiff must

demonstrate: (1) that her employer is subject to the statute;

(2) that she suffers from a disability within the meaning of the

statute; (3) that she could perform the essential functions of

her job with or without a reasonable accommodation; and (4) that

she suffered an adverse employment action because of the

disability.  See Brady v. Wal-Mart Stores, 531 F.3d 127, 134 (2d

Cir. 2008); Reeves v. Johnson Controls World Servs., Inc., 140

F.3d 144, 149-50 (2d Cir. 1998); Ryan v. Grae & Rybicki P.C.,

135 F.3d 867, 869-70 (2d Cir. 1998); Hawana v. New York City,

230 F.Supp. 2d 518, 530-31 (S.D.N.Y. 2002); Usala v. Consol

Edison Co., 141 F. Supp. 2d 373, 380 (S.D.N.Y. 2001).

If the plaintiff meets the minimal burden of establishing a

prima facie case, the burden of production then shifts to the

defendant to offer a legitimate, nondiscriminatory rationale for

its actions. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502,

506-07 (1993); McDonnell Douglas, 411 U.S. at 802-03; Greenway,

---

[6] See Kinneary v. City of New York, 601 F.3d 151, 158 (2d Cir.
2010) ("[T]he same elements that must be proven to establish an
ADA claim must be also demonstrated to prove claims under NYSHRL
and NYCHRL.").

143 F.3d at 52; see also Robins, 2010 WL 2507047, at *6.  After the defendant articulates a legitimate reason for the action, the plaintiff must adduce evidence from which a reasonable factfinder could conclude that "discrimination played a role in [the] adverse employment decision."  See Henry v. Wyeth Pharm., Inc., 616 F.3d 134, 157 (2d Cir. 2010).

"The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981); see also Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S. 133, 143 (2000). Although summary judgment must be granted with caution in employment discrimination actions "where intent is genuinely in issue, . . . summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact."  Chambers, 43 F.3d at 40; see also Robins, 2010 WL 2507047, at *6.

The defendants argue principally that the plaintiff has not satisfied the second and fourth elements of a prima facie employment discrimination case.

A

1

19

The defendants assert that the plaintiff does not have a disability within the meaning of the ADA.[7]  Under the ADA, "disability" with respect to an individual is defined as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment . . . ."[8] 42 U.S.C. § 12102(1); see also Jacques v. DiMarzio, Inc., 386 F.3d 192, 199 (2d Cir. 2004). The plaintiff identifies her disability as "recovering alcoholism."  The plaintiff relies on "a record of such impairment" to satisfy the statutory requirement.  (Compl. ¶ 77; Pl.'s Opp'n Br. 15-16.)

The second definition of "disability" under the ADA "ensure[s] that people are not discriminated against because of

_____

[7] The defendants do not argue that the plaintiff does not have a disability within the meaning of the NYSHRL or the NYCHRL.
[8] Within the meaning of the NYSHRL, the term "disability" is defined as (a) a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques or (b) a record of such an impairment or (c) a condition regarded by others as such an impairment . . . ."  N.Y. Exec. Law § 292(21).  The definition under the NYSHRL is broader than under the ADA. See Giordano v. City of N.Y., 274 F.3d 740, 743 (2d Cir. 2001).  The term "disability" under the NYCHRL "means any physical, medical, mental or psychological impairment, or a history or record of such impairment."  N.Y.C. Admin. Code § 8-102(16).  It is possible to be "disabled" within the meaning of the City law, as it is under the State law, without showing that the disability "substantially limits" a major life activity. Giordano, 274 F.3d at 754.

a history of disability." Colwell v. Suffolk Cnty. Police
Dep't, 158 F.3d 635, 645 (2d Cir.1998), superseded by statute on
other grounds by 42 U.S.C. § 12102(3)(A).  To establish a record
of disability in this case, the plaintiff must show that (1) her
alcoholism was at one time an impairment that substantially
limited a major life activity (pursuant to 42 U.S.C.
§ 12102(1)(A)), and (2) she has a record of such impairment. See
Vanderbroek v. PSEG Power CT. LLC, 356 F. App'x 457, 459 n.2;
Buckley v. Consol. Edison Co., 127 F.3d 270, 273-274 (2d Cir.
1997), vacated on other grounds on reconsideration en banc, 155
F.3d 150 (2d Cir. 1998) (recovering alcoholic covered under the
ADA if he can show former alcoholism substantially limited a
major life activity).

     The plaintiff relies on Buckley for the proposition that,
if the plaintiff has a history of alcoholism, she is
automatically covered under § 12102(1)(B).  Even under Buckley,
however, the plaintiff's assertion that she has a record of
disability necessarily requires an evaluation of "actual
disability" under § 12102(1)(A) to show that the impairment was
substantially limiting with respect to major life activity.  A
record of disability can thus only be established if the
plaintiff can show (1) that she suffered from a physical or
mental impairment, (2) the life activity upon which the
plaintiff relies constitutes a major life activity under the

ADA, and (3) her impairment substantially limited the major life activity identified.  See Colwell, 158 F.3d 645-46.

First, as discussed, the plaintiff claims that she suffered from a physical or mental impairment because she was an alcoholic.  The Second Circuit Court of Appeals recognizes alcoholism as a disability within the meaning of the ADA.  See, e.g., Buckley, 127 F.3d at 273-274.  Second, the life activity on which the plaintiff relies is "working."  Working is a major life activity.  See 29 C.F.R. § 1630.2(i); see also Bartlett v. N.Y. State Bd. of Law Exam'rs, 226 F.3d 69, 74 (2d Cir. 2000).  The EEOC's regulations are not binding, but they are accorded deference.  See Bartlett, 226 F.3d at 79.

Third, the plaintiff claims that her alcoholism "substantially limited" her ability to work.  To meet this standard, the plaintiff must show that her disability either (1) caused the plaintiff to be "[u]nable to perform a major life activity that an average person in the general population can perform;" or (2) "[s]ignificantly restricted as to the condition, manner or duration under which the plaintiff c[ould] perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform the same major life activity."  29 C.F.R. § 1630.2(j)(1)(i)-(ii).

Factors that courts consider in determining substantial limitation include: (i) the nature and severity of the impairment; (ii) its duration or expected duration, and; (iii) the existence of any actual or expected permanent or long term impact.  29 C.F.R. § 1630.2(j)(2)(i)-(iii); see also Capobianco v. City of New York, 422 F.3d 47, 57 (2d Cir. 2005).  When assessing whether a plaintiff is substantially limited with respect to working, courts look at the degree to which the plaintiff's impairment prevents her from performing a broad range of jobs, not simply an inability to perform a single particular job.  See 29 C.F.R. § 1630.2(j)(3)(1); see also Darcy v. Lippman, 356 F. App'x 434, 437 (2d Cir. 2009) (summary order) (citing Bartlett, 226 F.3d at 83).  Typically, "it is only in connection with the determination of whether an impairment 'substantially limits' a particular plaintiff's exercise of a major life activity that an individualized inquiry is required." Johnson Controls World Servs., Inc., 140 F.3d at 152.

Here, the plaintiff relies on evidence in the record that supports the proposition that she was unable to work at all during certain times of her life due to her alcoholism.  For example, for a period prior to 1984, the plaintiff drank alcohol nearly every day of the week and would often "black out." Additionally, the plaintiff entered a rehabilitation center in 1984 for approximately one month, and it was at that time when

she was first diagnosed as an alcoholic. (Behringer Dep. 102-106.)  The plaintiff stopped going to work entirely in January 1993 once she realized she was relapsing.  She was subsequently hospitalized at different rehabilitation facilities from January 1993 to September 1993 for alcoholism and related medical conditions.[9] (Compl. ¶ 18; Behringer Dep. 106-08, 143-44, 146-48, 158-162.)

A single hospitalization for a discrete injury, while it creates a "record," does not necessarily amount to a substantial inability to work.  See Colwell, 158 F.3d at 645-46 (month-long hospital stay with six-month recovery and vague residual limitations not "substantially limiting" with respect to working); Burch v. Coca-Cola Co., 119 F.3d 305, 322 (5th Cir. 1997) (single hospitalization for alcoholism alone insufficient to substantially limit a major life activity); but see Lanci v. Andersen, 96 Civ. 4009, 2000 WL 329226 (S.D.N.Y. Mar. 29, 2000) (severe symptoms from Tourette's Syndrome for three months and less severe symptoms extending to at least eight months sufficient to establish an issue of fact as to persistence of disability).

---

[9] Written records support the plaintiff's testimony, but she is also able to rely upon her testimony to establish a record of an impairment.  See Pace v. Paris Maint. Co., 107 F. Supp. 2d 251, 260-61 (S.D.N.Y. 2000).

The evidence adduced here shows that Behringer was hospitalized on more than one occasion for extended periods, experienced a relapse of her chronic condition, and a relapse thereafter remained possible.  Further, the fact that Behringer could no longer go to work in January 1993 makes this situation different from that in Burch, where the plaintiff failed to show that "the effects of his alcoholism-induced inebriation were qualitatively different than those achieved by an overindulging social drinker."  Burch, 119 F.3d at 316.

The defendants contend that, even if the plaintiff has a history of alcoholism, as a matter of law, "Simpson would have needed to see and rely on the records for them to have probative value." (Defs.' Reply Mem. 5 n.2.)  They argue that no ascertainable limits on life activity were specifically noticed in any of the plaintiff's benefits forms, and that she failed to disclose her history of alcoholism in medical records submitted to Lavelle during the period from 2003 – 2007.  Therefore, they assert that the plaintiff cannot be covered under the ADA.

However, there is a difference between the second step of the prima facie case, which asks whether the plaintiff suffers from a disability within the meaning of the statute, and the fourth step, which asks whether the plaintiff suffered from an adverse employment action because of her disability.  The degree of reliance by the employer is more appropriately considered in

25

the context of whether there is a causal relationship between the plaintiff's disability and the adverse action taken by the employer.  In Buckley, the Court of Appeals for the Second Circuit found that the plaintiff was disabled based on a record of disability where the recovering alcoholic showed that his former alcoholism substantially limited a major life activity. 127 F.3d at 273-275; see also Johnson v. St. Clare's Hosp., No. 96 Civ. 1425, 1998 WL 213203, at *6 (S.D.N.Y. Apr. 30, 1998) (same).

In Colwell, the Court of Appeals did state that the definition "is satisfied if a record relied on by an employer indicates that the individual has or has had a substantially limiting impairment."  158 F.3d at 645; see also Saunders v. New Horizons Computer Learning Ctr. of Metro. N.Y., No. 99 Civ. 9532, 2002 WL 1067823, at *4 (S.D.N.Y. May 29, 2002) (same). However, the issue of reliance was not determinative in Colwell because the Court of Appeals found that the records at issue did not contain a record of a disability.  Most recently, the EEOC has expressed its view that the "record" of a disability does not depend on whether an employer relied on a record in making an employment decision.[10]

---

[10] The EEOC has sought to clarify this point in its proposed regulations for the ADA Amendments Act of 2008.  The ADA Amendments Act of 2008 does not apply retroactively.  However, the amendments do not change the definition of a "record" of

In this case, the plaintiff has presented sufficient evidence to show that there is a genuine issue of material fact as to whether she has a record of disability based on all of the factual circumstances relating to her recovering alcoholism. Therefore, the plaintiff is covered under the ADA.

2

The plaintiff must also establish that she was subjected to an adverse employment action under circumstances giving rise to an inference of disability discrimination within the meaning of the statute.  To allege an adverse employment action, the plaintiff must demonstrate that she was subjected to a "materially adverse change in the terms and conditions of employment."  Galabya v. N.Y.C. Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000) (internal quotation marks omitted).  Examples of materially adverse employment actions include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits,

---

disability.  The EEOC has explained its interpretation of a "record" of disability.  The EEOC affirms that "coverage under the 'record of' prong of the definition of 'disability' does not depend on whether an employer relied on a record (e.g., medical, vocational, or other records that list the person as having a disability) in making an employment decision.  An employer's knowledge of an individual's past substantially limiting impairment relates to whether the employer engaged in discrimination, not to whether an individual is covered." U.S. Equal Employment Opportunity Commission, Questions and Answers on the Notice of Proposed Rulemaking for the ADA Amendments Act of 2008 (EEOC Sept. 23, 2009), available at http://www.eeoc.gov/policy/docs/qanda_adaaa_nprm.html.

significantly diminished material responsibilities, or other
incidents unique to a particular situation." Sanders v. N.Y.C.
Human Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004).

The plaintiff relies on her February 2007 discharge as the
alleged adverse employment action.  With respect to her
discharge, the plaintiff argues that discriminatory intent can
be inferred from the pattern of escalating negative actions that
occurred between the disclosure of her status as a recovering
alcoholic in June 2006 and her employment termination in
February 2007.  Without any direct proof, the "timing or
sequence of events leading to the plaintiff's termination" can
be a circumstance that gives rise to an inference of
discrimination. Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d
81, 91 (2d Cir. 1996).

There is no "bright line to define the outer limits beyond
which a temporal relationship is too attenuated to establish a
causal relationship." Gorman-Bakos v. Cornell Co-op Extension
of Schenectady Cnty., 252 F.3d 545, 554 (2d Cir. 2001)
(suggesting lapse of five months between protected activity and
relationship may show a causal relationship).  The plaintiff
claims that Simpson engaged in escalating, negative conduct
towards her over an eight-month period until an opportunity to
fire her presented itself during the February 2007 incident.
 This temporal proximity together with escalating negative

conduct could give rise to an inference of discrimination.  See
Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2009) (passage of
six months sufficient to support inference of discrimination
when defendants waited for an "opportune time" to retaliate
against the plaintiff so they would have a ready explanation).
Therefore, however attenuated, there is evidence to support an
inference of discrimination with respect to temporal proximity,
and the plaintiff has established a prima facie case under the
ADA.

3

The defendants claim that, even if the plaintiff
establishes a prima facie case, there was a legitimate,
nondiscriminatory reason for the plaintiff's termination.
Specifically, the defendants argue that Simpson decided to
discharge the plaintiff for her inappropriate conduct during the
incident in the gymnasium on February 13, 2007.  Evidence on the
record supports this assertion: Simpson allegedly received
complaints from school personnel regarding the situation; he
conducted an investigation into the incident; and, after coming
to a conclusion, Simpson discharged Behringer, stating within
her termination memorandum that her "behavior in the work
environment . . . is unacceptable for an administrator and a
Lavelle School Employee." (Defs.' 56.1 Stmt. ¶¶ 80-81.)  The

defendants insist that the plaintiff cannot show that the
defendants were motivated by discriminatory intent, or that
their proffered rationale was pretextual.  Further, the
defendants argue that regardless of the truth of the allegations
against the plaintiff, the defendants "reasonably, and in good
faith" made a decision to terminate the plaintiff without any
invidious motivation, which should be enough to articulate
legitimacy.  (Defs.' Mot. 19 (citing McPherson v. N.Y.C. Dep't
of Educ., 457 F.3d 211, 216 (2d Cir. 2006)).)

The plaintiff asserts that the defendants' proffered reason
for termination is pretextual.  In support of this assertion,
the plaintiff first attacks the defendants' representation of
the incident as inaccurate.  The plaintiff maintains that she
handled the situation appropriately and that Simpson was aware
of this. (Pl.'s Opp'n Br.  10.)  For example, Simpson received
the e-mail message between Wier and Behringer noting that
Secada's actions on February 13, 2007, may have been
inappropriate, and that Secada had apologized for his behavior.
 (Pl.'s Opp'n Br. 18.) The plaintiff also points to two ways in
which the defendants have "changed their stor[ies]" in light of
the current litigation. (Pl.'s Opp'n Br. 16.)  First, the
defendants allegedly stated to the EEOC in 2007 and 2008 that
Simpson did not know that the plaintiff was a recovering
alcoholic until she told him in June 2006.  (Pl.'s Opp'n Br. 16-

30

17.)   Simpson now claims that he has known about the
plaintiff's condition for years.  (Pl.'s Opp'n Br. 16-17.)
Second, and also during the EEOC proceedings, Simpson alleged in
written submissions to the EEOC that he had fired the plaintiff
because of six years of unacceptable job performance.  (Pl.'s
Opp'n Br. 17.)  However, during his 2010 deposition, Simpson
testified that the sole reason for the plaintiff's discharge was
her behavior during the February 13, 2007 incident.  (Pl.'s
Opp'n Br. 16-17.)

While the defendants have set forth a legitimate and
nondiscriminatory reason for the plaintiff's discharge, the
defendants' current arguments do contradict information set
forth during the EEOC proceedings, which could be evidence of
pretext.  Carlton v. Mystic Transp., Inc., 202 F.3d 129, 137 (2d
Cir. 2000) ("The inconsistency between the justifications
offered for . . . dismissal in the two proceedings raises a
genuine issue of material fact with regard to the veracity of
[the] non-discriminatory reason.").  There is also a factual
dispute about Simpson's knowledge and opinions of Behringer's
behavior during the February 13, 2007, incident.[11]

---

[11] Evidence that the explanations for the discharge were false
also suggests the fourth element of the prima facie case—namely,
that the adverse action occurred under circumstances giving rise
to an inference of discrimination.  See Reeves, 530 U.S. at 146-
47.

There are thus genuine issues of material fact as to whether the defendants' proffered reason for the plaintiff's discharge was pretextual and whether the plaintiff was discharged from her role as Lower School principal because of a record of disability.  Therefore, the defendants' motion to dismiss the claim of disability discrimination under the ADA, the NYSHRL, and the NYCHRL is denied.

B

The plaintiff alleges that she was subjected to a hostile work environment.  Hostile work environment claims under the ADA[12] and the NYSHRL, are analyzed using the same standard applied to Title VII hostile work environment claims.  See Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 609 (2d Cir. 2006); Monterroso v. Sullivan & Cromwell, LLP, 591 F. Supp. 2d 567, 584 (S.D.N.Y. 2008) (ADA).

To establish a prima facie case of hostile work environment, the plaintiff must show that 1) she "is a member of a protected class"; 2) she "suffered unwelcome harassment"; 3) she "was harassed because of her membership in a protected

_____

[12] While the Second Circuit Court of Appeals "has not expressly held that the ADA authorizes claims for hostile work environment, district courts have found that the ADA encompasses hostile work environment claims." Monterroso, 591 F. Supp. 2d at 584; see also Ragusa v. Malverne Union Free Sch. Dist., 381 F. App'x 85, 88 n.3 (2d Cir. 2010) (summary order) (declining to reach the question of whether a hostile work environment claim is available under the ADA).

class"; and 4) "that the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment." Monterroso, 591 F. Supp. 2d at 584.

The standard is "demanding," and the alleged harassment must be sufficiently "offensive, pervasive, and continuous . . . to create an abusive working environment." Id. at 585 (internal citation and quotation marks omitted). To determine whether conduct rises to such a level, courts examine the "case-specific circumstances in their totality and evaluate the severity, frequency, and degree of abuse." Robins, 2010 WL 2507047, at *11 (citing Harris v. Forklift Sys. Inc., 510 U.S. 17, 23 (1993)).

The parties contest whether the following incidents constitute "harassment" under the statutes: (1) during a summer 2006 staff meeting, Simpson yelled at the plaintiff regarding scheduling issues, making her cry; (2) when the plaintiff returned to work in fall 2006, Simpson greeted her by saying something to the effect of "I'm surprised you came back;" (3) in December 2006, Simpson repeatedly offered the plaintiff a presumably alcoholic drink during a holiday party; and (4) in January 2007, Simpson gave the plaintiff a written warning for violating an attendance policy. (Defs.' 56.1 Stmt. ¶¶ 54-58.)

The plaintiff has failed to plead any facts or adduce any evidence tending to show that this conduct was severe or

pervasive.  These four incidents—whether considered separately
or together—do not rise to the level necessary to establish
pervasive harassment under the ADA or the state or city
statutes.  Further, "insensitive comments are not per se
unlawful." Scott v. Mem'l Sloan-Kettering Cancer Ctr., 190 F.
Supp. 2d 590, 599 (S.D.N.Y. 2002) (citing Williams v. Cnty. of
Westchester, 171 F.3d 98, 101 (2d Cir. 1999)).  Moreover, there
is no evidence that shows the incidents were predicated upon the
plaintiff's disabled status.  Indeed, the plaintiff's fellow
principals were exposed to the same types of sporadic,
sarcastic, or cold behavior. (Nanry Dep. 34-37; Tucker Dep. 52-
53.)

     The plaintiff argues that the standard under the NYCHRL is
broader than that of its state and federal counterparts.
Indeed, a more lenient standard for hostile work environment
under the NYCHRL was articulated in Williams v. N.Y.C. Hous.
Auth., 872 N.Y.S.2d 27, 38-40 (1st Dep't 2009) (construing
harassment requirements in the context of gender
discrimination); see also Sims v. City of New York, 08 Civ.
5965, 2010 WL 3825720, at *12 (S.D.N.Y. Sept. 30, 2010).  The
Williams Court found that the NYCHRL, which was created to stem
unequal treatment and unwanted conduct, would be more effective
if it dispensed with the "severe or pervasive" standard
applicable to claims under federal law and the NYSHRL.  See

Fullwood v. Ass'n for the Help of Retarded Children, Inc., 08
Civ. 6739, 2010 WL 3910429, at *9 (S.D.N.Y. Sept. 28, 2010)
(citing Williams, 872 N.Y.S.2d at 40).  The broader purposes of
the NYCHRL, however, "do not connote an intention that the law
operate as a general civility code."  Sims, 2010 WL 3825720, at
*12 (internal citation omitted).  Summary judgment is available
where the complained of conduct "could only be reasonably
interpreted by a trier of fact as representing no more than
petty slights or trivial inconveniences."  Id. (quoting
Williams, 872 N.Y.S.2d at 41).

     Here, a reasonable finder of fact could only conclude that
the instances that the plaintiff alleges were "harassing," or
"pervasive," were no more than "petty slights and
inconveniences."

     Therefore, even with all reasonable inferences drawn in the
plaintiff's favor under each statute, the plaintiff fails to
state a viable claim for hostile work environment under the ADA,
NYSHRL, or NYCHRL.  Therefore, the plaintiff's hostile work
environment claims are dismissed.


                              IV

     The plaintiff brings claims under the FMLA against both

                              35

Lavelle and Simpson,[13] alleging that they discriminated or retaliated against her for the exercise of her rights or the attempt to exercise them.[14]

Under 29 U.S.C. § 2615(a)(1), it is unlawful to "interfere with, restrain, or deny the exercise of or the attempt to exercise," any right protected by the FMLA.  Under 29 U.S.C. § 2615(a)(2), it is unlawful to "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA.  29 U.S.C. § 2615(a)(2).  This Court also recognizes retaliation claims under § 2615(a)(1) when an employer discriminates against an individual for exercising her right to take FMLA leave.  See Drew v. Plaza Constr. Corp., 688 F. Supp. 2d 270, 276 (S.D.N.Y. 2010) (inference and retaliation claims brought concurrently under § 2615(a)(1) are not redundant); see also 29 C.F.R. § 825.220(c).

FMLA retaliation claims are evaluated under the burden-shifting McDonnell Douglas framework.  See Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 175-76 (2d Cir. 2006); Potenza v. City

---

[13] The defendants do not argue that Simpson cannot be held liable under the FMLA as an individual defendant.  Some courts have found that individual defendants can be held liable in FMLA claims.  See Mitchell v. Chapman, 343 F.3d 811, 827 (6th Cir. 2003); Darby v. Bratch, 287 F.3d 673, 680-81 (8th Cir. 2002); Johnson v. A.P. Prods., 934 F. Supp. 625, 627-29 (S.D.N.Y. 1996); see also 29 C.F.R. § 825.104(d).

[14] The plaintiff made it clear at oral argument that she was not asserting a claim that the defendants interfered with her right to claim FMLA benefits.  She was granted the FMLA leave that she sought.

of N.Y., 365 F.3d 165,167-68 (2d Cir. 2004) (per curiam).  To
establish a prima facie case of retaliation under § 2615(a), the
plaintiff must show that (1) she exercised her rights under the
FMLA, (2) she was qualified for her position, (3) she was
subjected to an adverse employment action, and (4) the adverse
action occurred under circumstances raising a reasonable
inference of retaliatory intent.  See Potenza, 365 F.3d at 168.

The defendants argue that the plaintiff has not established
the first element of a prima facie case for a claim under
§ 2615(a)(2).  The third and fourth elements are contested by
the parties under both § 2615(a)(1) and § 2615(a)(2).

1

Under § 2615(a)(2), the plaintiff appears to argue that she
asserted her right to oppose unlawful conduct under the FMLA
when she (1) gave Simpson the memorandum of December 15, 2005,
complaining about his inquiries into her leave and his counting
holidays as FMLA days; and (2) complained orally to D'Andrea
about these matters on December 21, 2005.

The defendants claim that their conduct was not unlawful
under the FMLA, and so could not be opposed as such.  Therefore,
the defendants contend that plaintiff did not properly exercise
a right under § 2615(a)(2).  The defendants argue that inquiring
into an employee's FMLA leave is appropriate where an employer
believes that leave is being misused.  (Defs.' Mot. 22 (citing

Leboeuf v. N.Y. Univ. Med. Ctr., No. 98 Civ. 0973, 2000 WL
1863762, at *3 (S.D.N.Y. Dec. 20, 2000)).)   The defendants also
argue that holidays may be counted against leave entitlement
where, as here, an individual takes leave on an intermittent
basis.   See Mellen v. Trs. of Boston Univ., 504 F.3d 21, 24-25
(1st Cir. 2007).   However, an individual is "similarly protected
if [she] oppose[s] any practice which [she] reasonably
believe[s] to be a violation of the Act or regulations."   29
C.F.R. § 825.220(e); Cf. Treglia v. Town of Manilus, 313 F.3d
713, 719 (2d Cir. 2002) (evaluating similar regulatory
provisions under Title VII and the ADEA).   Viewing the facts in
the light most favorable to the plaintiff, she satisfies the
first element of a prima facie case of FMLA retaliation: she
honestly believed that the inquiries and policies outlined in
Simpson's memorandum unlawfully violated her rights under the
FMLA.   (See Behringer Dep. 582-88.)

2

        Turning to the third element of a prima facie case under
each subsection, the parties contest what is considered an
adverse employment action.   In assessing an "adverse employment
action" in the context of retaliation, this Court has identified
"termination, failure to promote, denial of transfer, or a
refusal to rehire as examples of discriminatory employment
acts."   McFarlane v. Chao, No. 04 Civ. 4871, 2007 WL 1017604, at

*23 (S.D.N.Y. March 30, 2007) (internal quotations omitted). Recently, however, the Second Circuit Court of Appeals has invoked the Supreme Court's Title VII retaliation-specific "adverse employment action" standard for ADA as well as Title VII retaliation claims.  See Ragusa, 381 F. App'x at 90 (citing Hicks v. Baines, 593 F.3d 159, 165 (2d Cir. 2010)); see also Burlington N. & Santa Fe Ry. V. White, 548 U.S. 53, 69 (2006).

     Under this standard, an "adverse employment action" is any action "harmful to the point that [it] could well dissuade a reasonable worker" from exercising her rights under the Act. Ragusa, 381 F. App'x at 90 (internal citations and quotation marks omitted); see also Breneisen v. Motorola, Inc., 512 F.3d 972, 979 (7th Cir. 2008) ("Materially adverse actions are not limited to employment-related activities but include any actions that would dissuade a reasonable employee from exercising his rights under the FMLA.").  This standard protects "not from all retaliation, but from retaliation that produces injury or harm." Fincher v. Depository Trust and Clearing Corp., 604 F.3d 712, 721 (2d Cir. 2010) (quoting Burlington N., 548 U.S. at 67 (2006)).  This standard, which is applied to Title VII and ADA claims, should reasonably be applied to retaliation claims under the FMLA.  There is no basis to distinguish FMLA retaliation claims.

In this case, the plaintiff alleges primarily that two incidents[15] constitute adverse employment actions under the FMLA: (1) Simpson issued the plaintiff a negative performance evaluation in January 2006, and (2) Simpson discharged the plaintiff in February 2007.  Termination is an adverse employment action.  Moreover, a negative performance evaluation could plausibly dissuade a reasonable worker from exercising her FMLA rights.  Here, the negative evaluation was also harmful, according to the plaintiff, because it became a part of her personnel file and "raised false criticisms of her job performance, placing her job in jeopardy and setting her up for discharge." (Pl.'s Opp'n Br. 22.)  The plaintiff's January 2006 negative performance review and February 2007 discharge are thus adverse employment actions for the purposes of evaluating her retaliation claims under the FMLA.

3

The defendants argue that, regarding the fourth element of a prima facie case, an inference of retaliatory intent cannot be

---

[15] In her brief, the plaintiff notes generally that Simpson "engaged in acts of discrimination, harassment and retaliation" against the plaintiff in the summer of 2006, winter of 2006, and January 2007.  (Pl.'s Opp'n Br. 23.)  None of these instances is discussed with any specificity, and it is unclear whether the plaintiff alleges that any particular act within this timeframe, standing alone, amounts to an adverse employment action.  At argument, the plaintiff made it clear that she was relying on two incidents, namely the adverse January 2006 performance review and the February 2007 termination.

drawn.   Temporal proximity between a plaintiff's exercise of
FMLA rights and an adverse employment action can give rise to an
inference of retaliation where the "protected activity was
closely followed in time by the adverse action."   Cifra v. Gen.
Elec. Co., 252 F.3d 205, 217 (2d Cir. 2001).   There was close
temporal proximity between the plaintiff's December 2005
complaints about her treatment in connection with her FMLA leave
and her negative January 2006 performance review.   The temporal
proximity is more attenuated with her February 2007 discharge.
However, the plaintiff can rely on the allegedly escalating
negative actions toward her combined with the allegedly false
explanations for her discharge together with the temporal
proximity to raise an inference of retaliation.

4

        With respect to her termination, as discussed above, a
reasonable jury could find that the asserted reason for her
termination was a false reason for that action and, combined
with the negative performance evaluation following so closely or
her complaint about the treatment of her FMLA leave, and
subsequent negative conduct, the jury could find that the reason
for her termination was a pretext for retaliation.

        The defendants also proffer a legitimate, nondiscriminatory
reason for the negative performance review.   They assert that
the evaluation was based on data Simpson had collected for

41

months.   This assertion is supported by Simpson's deposition testimony, where he details his evaluation process.   (Simpson Dep. 125-139.)   The defendants offer several reasons for this poor performance evaluation, including, among other things: the plaintiff's alleged excessive use of Lavelle telephone lines for personal long-distance telephone calls; her alleged failure to consult other school principals regarding scheduling matters; her alleged refusal to use didactic "tangible cues" in the classroom; and her alleged frequent tardiness. (Defs.' Mot. 8-9; Defs.' 56.1 Stmt. ¶¶ 45, 47-48.)   Simpson also testified during his deposition that Behringer told an occupational therapist that Simpson was forcing Lavelle to be "out of compliance," and her statement in this regard also had bearing on her negative evaluation.   (Simpson Dep. 135-36.)   The defendants also proffer phone bills as documentation.   Therefore, the defendants have set forth alleged non-discriminatory reasons for the plaintiff's review.

The plaintiff must proffer evidence that discrimination was a cause of the negative evaluation.   Temporal proximity can support a prima facie showing of discrimination, but usually something more is required to show evidence of discriminatory intent once defendants have articulated a legitimate reason for the adverse action.   See Peters v. Mount Sinai Hosp., No. 08 Civ. 7250, 2010 WL 1372686, at *11-12 (S.D.N.Y. Mar. 30, 2010).

Behringer alleges that the content within the January 2006 evaluation was "false," and that her performance had been "exemplary."  She argues that she reimbursed the defendants for her telephone calls, and asserts that she received permission to make the calls.  (Berhringer Aff. ¶ 5.)  The plaintiff also maintains that she used "tangible cues" in the classroom. (Behringer Aff. ¶ 6.)  Further, the plaintiff claims that she never told an occupational therapist that Simpson was forcing Lavelle to be "out of compliance."  (Behringer Aff. ¶ 7.)  Also, while the defendants argue that Behringer's tardiness was a motivating factor in issuing the negative review, the evaluation actually states that Behringer "met expectations" with respect to punctuality.  (Behringer Dep. Pl.'s Ex. 45.)

The plaintiff also points to D'Andrea's meeting with Simpson on December 21, 2005, where D'Andrea related what the plaintiff had said to him regarding her FMLA leave:  her belief that Lavelle was somehow manipulating her FMLA days.  (D'Andrea Dep. 25-27, 54.)

 Genuine issues of material fact are raised as to the factors that motivated the negative evaluation.  At this stage in the litigation, it is not appropriate to determine the credibility of either party with respect to the issues implicated in the January 2006 negative performance review.

44

Therefore, the defendants' motion to dismiss the plaintiff's FMLA retaliation claims is denied.

## CONCLUSION

For the reasons stated above, the defendants' motion for summary judgment is **granted** on the plaintiff's ADA, NYSHRL, and NYCHRL retaliation claims, because the plaintiff agreed to withdraw those claims and on the plaintiff's ADA, NYSHRL, and NYCHRL hostile work environment claims, all of which are **dismissed**, and on any claim of interference with the plaintiff's rights under the FMLA which is withdrawn.  The defendants' motion for summary judgment is **denied** on all other claims. The Clerk of the Court is directed to close docket No. 20.

**SO ORDERED.**

**Dated:     New York, New York**
**           December 17, 2010**

                                        John G. Koeltl
                                   United States District Judge

44